David WILLIAMS, in his capacity as Sheriff of Tarrant County, Texas, and Tarrant County, Texas, Petitioners,

v.

Ruth Maree LARA and Michael Huff, Respondents.

No. 99–0273.

Supreme Court of Texas.

Argued Feb. 23, 2000.

Decided June 28, 2001.

---

Russell A. Friemel, Van Thompson, Jr., Assistant District Attorney, Kristi LaRoe, Office of the Criminal District Attorney, Fort Worth, for Petitioners.

Laurance L. Priddy, Aledo, Richard A. Rohan, Carrington Coleman Sloman & Blumenthal, Dawn Ryan Budner, Bell Nunnally & Martin, Barbara M.G. Lynn, Christopher John Scanlan, Carrington

Coleman Sloman & Blumenthal, Dallas, for Respondents.

Justice HANKINSON delivered the opinion of the Court.

This case involves a dispute over a religious-education program in a Tarrant County jail facility. Our inquiry focuses on the Chaplain's Education Unit (CEU), a separate unit within the Tarrant County Corrections Center (TCCC), where inmates can volunteer for instruction in a curriculum approved by the sheriff and director of chaplaincy at the jail as consistent with the sheriff's and chaplain's views of Christianity. Ruth Maree Lara and Lee Huff, former inmates at the TCCC, and Dr. Ronald Flowers, a Tarrant County resident, sued Tarrant County and its sheriff, David Williams [1] (collectively, "the County"), for operating the CEU in violation of the Establishment, Free Exercise, and Equal Protection Clauses of the United States and Texas Constitutions, and for violating their civil rights under 42 U.S.C. § 1983. The plaintiffs asserted claims for damages, injunctive and declaratory relief, and attorney's fees.

This appeal presents two principal questions: first, whether any of the plaintiffs have standing to assert their claims; and second, whether the operation of the CEU is an unconstitutional establishment of religion. The County contends that the plaintiffs do not have standing to obtain the relief they seek. Alternatively, it urges that the CEU's purpose is secular and that its operation is not unconstitutional. Flowers and Lara respond that they have standing as Tarrant County taxpayers, and Huff and Lara respond that they have standing as former TCCC inmates. Collectively, the plaintiffs argue that the CEU operates to advance the personal religious beliefs of the unit's administrators. They further maintain that involving county employees in the CEU's operation not only excessively entangles the government with religion, but also improperly suggests that the County favors the religious views taught in the CEU over the views of other religions or nonreligion.

In the trial court the parties filed cross-motions for summary judgment. Concluding that the CEU program was constitutional, the court granted the defendants' summary-judgment motion, denied the plaintiffs' motions, and ordered that the plaintiffs take nothing. The court of appeals affirmed in part, and reversed and remanded in part. 986 S.W.2d 310. The court of appeals determined that Flowers lacked standing, but that Lara and Huff had standing as former inmates. *Id.* at 315. In considering the parties' Establishment Clause claims, the court concluded that fact issues precluded summary judgment for either side. It therefore reversed and remanded for the trial court to determine whether the operation of the CEU violates the Establishment Clauses of our state and federal constitutions. *Id.* at 319. The court affirmed the trial court's judgment favorable to the defendants in all other respects, including its disposition of the plaintiffs' Free Exercise, Equal Protection, and section 1983 claims. *Id.* at 320–23.

We disagree with the court of appeals' conclusions concerning standing. Because public funds are expended in running the CEU, we conclude that Flowers has standing as a taxpayer to enjoin its operation. We also conclude that while Lara and Huff have standing as former inmates to pursue monetary relief, they lack standing to pursue injunctive and declaratory relief; those claims are moot. We further disagree with the court of appeals' conclusion that

---

1. Williams is no longer the sheriff of Tarrant County.

the Establishment Clause dispute in this case presents a fact question. Instead, we conclude as a matter of law that based on the record in this case, the County's operation of the CEU is an unconstitutional establishment of religion. Therefore, the trial court should determine whether injunctive relief, as sought by Flowers, is appropriate, and whether Lara is entitled to damages under section 1983. We also disagree with the court of appeals' conclusion concerning Huff's free-exercise complaint. We conclude that fact issues preclude summary judgment on Huff's free-exercise challenge, and thus whether his free-exercise rights were violated is again an issue for the trial court. Finally, because no party with standing to do so seeks monetary relief for violations of the Equal Protection Clause, we cannot address the merits of the parties' equal-protection complaint. For these reasons, we vacate in part and reverse in part the court of appeals' judgment, dismiss for want of jurisdiction the equal-protection claims, render judgment declaring the operation of the CEU unconstitutional, and remand the remaining claims to the trial court for further proceedings consistent with this opinion.

## I. Background

The Tarrant County Corrections Center is a county jail facility that houses inmates who are serving sentences, awaiting trial, or awaiting transfer to the Texas Department of Criminal Justice. The Chaplain's Education Unit is one of many jail pods, or cluster of jail cells within the TCCC, where inmates live. Tarrant County, at the behest of Warden James Skidmore and other county employees, created the original CEU in 1992. It was initially open only to male inmates, but a women's CEU was added the following year. Admission

to the CEU is voluntary. To be admitted, an inmate must receive security clearance. He or she also must sign an "Application and Agreement," acknowledging that the CEU is "based on orthodox Christian biblical principles" and confirming a willingness to "cooperate fully with the program." Inmates are admitted into the CEU for 120 days and then released back into the jail's general population.

The CEU's purported goals are to promote rehabilitation and reduce violence, which, according to the Director of Chaplaincy, Hugh Atwell,[2] are best accomplished through the teaching of what Williams and Atwell labeled "orthodox Christianity." Atwell explained their views as "generally believing in Jesus Christ as deity, with the Bible being the scripture that is utilized in that belief system . . . and that the scripture is holy and it is accepted as an infallible truth," and that a person must be "born again" to attain salvation. Sheriff Williams and Chaplain Atwell testified that they would not allow instructors to discuss any other religious viewpoint, and the sheriff acknowledged that he would limit what could be taught in the CEU to that which comported with his own personal religious views. As part of the CEU program, inmates are taught in accordance with those views at least four hours a day. They spend the rest of their day completing assignments, studying the Bible, and reviewing other religious books or videotapes. Volunteer chaplains teach the inmates using donated materials. To maintain their positions, the volunteer chaplains must remain members in good standing of a local church.

Sheriff Williams had ultimate authority over and responsibility for the county jail, *see* Tex. Loc. Gov't Code § 351.041, which in this case includes the CEU and its

---

2. Atwell is no longer employed by the County.

curriculum. Chaplain Atwell was second-in-command. Like the sheriff, he was a paid employee of Tarrant County. Chaplain Atwell interviewed and selected the CEU's volunteer instructors, who were subject to background checks, and met with them weekly. He also met weekly with Sheriff Williams to apprise him of the CEU's progress and to discuss periodically the CEU's curriculum. Directly under Chaplain Atwell was Volunteer Chaplain Don Anderson, the CEU Director. Anderson was responsible for the CEU's daily operation. He was not a county-paid employee but was required to work a minimum of thirty hours a week to retain his position. He too participated in interviewing instructors and determining the appropriate curriculum for the CEU.

Except for a Tuesday night service, which is open to the jail's general population but follows the same curriculum as does the CEU, living in the CEU is the only opportunity county jail inmates have for any type of group religious study. Inmates outside the CEU may meet with spiritual advisors, but the advisor's local religious body must grant him or her permission to represent the religion, and the meeting must occur across a glass window via telephone. Sheriff Williams and Chaplain Atwell expressed a willingness to allow representatives from other religions to take part in the Tuesday night service, but only if those representatives taught from the CEU curriculum.

Plaintiffs Ruth Maree Lara and Lee Huff are former TCCC inmates who did not participate in the CEU program. They, along with Dr. Ronald Flowers, a Tarrant County resident and taxpayer, sued Tarrant County and Sheriff Williams for operating the CEU in violation of the Establishment, Free Exercise, and Equal Protection Clauses of the United States and Texas Constitutions, and for violating their civil rights under 42 U.S.C. § 1983. *See* U.S. Const. amends. I, XIV; Tex. Const. art. I, §§ 3, 3a, 6, 7. They seek damages, injunctive and declaratory relief, and attorney's fees.

In the trial court the parties filed cross-motions for summary judgment, each side urging that the CEU is either constitutional or unconstitutional as a matter of law. The plaintiffs moved for partial summary judgment requesting only declaratory relief and acknowledging that assessing any other relief would require a factual inquiry. The court initially denied the motions on public-policy grounds. Later, a second judge who presided over the proceedings indicated her intent to reconsider the summary-judgment motions. The parties filed an agreement pursuant to Texas Rule of Civil Procedure 11 providing, in part, that the court could consider their earlier filed motions. Lara submitted a renewed motion for partial summary judgment, while Huff and Flowers chose to rely on their previous motion. The County again moved for summary judgment.

Four TCCC inmates who were then participating in the CEU program filed a petition in intervention. They asserted that granting the plaintiffs' partial summary-judgment motion would infringe upon the free exercise of their religious beliefs. Lara moved to strike the intervention.

Upon concluding that there were no questions of material fact to be determined, the trial court granted the County's summary-judgment motion, thereby upholding the constitutionality of the CEU program, and denied the plaintiffs' motions, ordering that the plaintiffs take nothing. The court also granted Lara's motion to strike the intervention. The plaintiffs appealed. The court of appeals affirmed in part, and reversed and remanded in part. 986 S.W.2d 310.

The court of appeals first addressed standing. Because it determined that public funds are not expended in administering the CEU, the court concluded that Flowers and Lara did not have standing as taxpayers to enjoin its operation. *Id.* at 314–15. But the court held that Lara and Huff had standing as former TCCC inmates. *Id.* at 315–16. The court reasoned that Lara's and Huff's standing arose from the "capable of repetition, yet evading review" exception to the mootness doctrine. *Id.* at 316. The court next concluded that under the standard set out in *Guaranty Federal Savings Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex.1990), the trial court did not abuse its discretion by striking the petition in intervention.[3] 986 S.W.2d at 316.

In considering whether the County's operation of the CEU constituted an impermissible establishment of religion, the court determined that the existence of fact issues precluded summary judgment for any party. *Id.* at 319. It therefore reversed and remanded for the trial court to determine whether the operation of the CEU violates the Establishment Clauses of our state and federal constitutions. *Id.* at 320. The court affirmed the trial court's judgment in all other respects, including the trial court's conclusion that the CEU violates neither the Free Exercise and Equal Protection Clauses nor the parties' rights under 42 U.S.C. § 1983. *Id.* at 320–24.

The plaintiffs petitioned this Court for review, again complaining that the operation of the CEU violates the Establishment Clause as a matter of law. Additionally, Lara and Flowers contend that the court of appeals erred in concluding that they lack standing as taxpayers, and Huff alleges that the court erred in holding that the County did not violate his rights under

the Free Exercise and Equal Protection Clauses. The County also petitioned for review. It complains that the court of appeals erred in concluding that Lara and Huff have standing as former TCCC inmates and in remanding to the trial court the plaintiffs' Establishment Clause claims. We granted the parties' petitions to determine whether the County's operation of the CEU is unconstitutional. We first decide who has standing to assert which claims.

## II. Standing

■ Standing is a constitutional prerequisite to maintaining suit in either federal or state court. *See Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 444 (Tex.1993). The parties in this case assert standing on various grounds. Alleging taxpayer standing, Flowers relies on his status as a Tarrant County property taxpayer, and Lara relies on her payment of rent and sales tax. Alternatively, Lara and Huff claim that as former TCCC inmates, they have suffered injuries sufficiently particular to confer standing. Relying on state law to analyze the standing issues, we address each of the parties' arguments separately. *See Bateman v. Arizona*, 429 U.S. 1302, 1305, 97 S.Ct. 1, 50 L.Ed.2d 32 (1976) ("The courts of a State are free to follow their own jurisprudence as to who may raise a federal constitutional question . . . .").

### Taxpayer Standing

■ As a general rule of Texas law, to have standing, unless it is conferred by statute, a plaintiff must demonstrate that he or she possesses an interest in a conflict distinct from that of the general public, such that the defendant's actions have caused the plaintiff some particular injury.

---

**3.** The intervenors have not filed a petition for review.

*See Hunt v. Bass,* 664 S.W.2d 323, 324 (Tex.1984). Taxpayers, however, fall under a limited exception to this general rule. *See Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 556 (Tex.2000). Taxpayers in Texas have standing to enjoin the illegal expenditure of public funds, and need not demonstrate a particularized injury. *See id.; Calvert v. Hull,* 475 S.W.2d 907, 908 (Tex.1972); *Osborne v. Keith,* 142 Tex. 262, 177 S.W.2d 198, 200 (1944). Implicit in this rule are two requirements: (1) that the plaintiff is a taxpayer; and (2) that public funds are expended on the allegedly illegal activity. *See Bland,* 34 S.W.3d at 556; *Calvert,* 475 S.W.2d at 908; *Osborne,* 177 S.W.2d at 200.

Flowers asserts that his status as a Tarrant County resident and property taxpayer gives him taxpayer standing to pursue his claims. He argues that because taxpayers have standing to enjoin the illegal expenditure of public funds, and public funds are required to administer the CEU, he has standing as a taxpayer to enjoin its illegal operation. According to Flowers, the County spends tax dollars to feed, clothe, and house the prisoners who participate in the CEU program. And he emphasizes that Sheriff Williams and Chaplain Atwell were county-paid employees, and that their time was partially occupied with supervising and monitoring the CEU.

Applying the same reasoning, Lara maintains that she too has standing as a taxpayer. Unlike Flowers, however, Lara does not own property and thus does not pay property taxes. She alleges that her taxpayer standing arises from her payment of rent on her Tarrant County residence and her payment of sales tax on the goods she purchases. Lara urges that her interest as a taxpayer is not lessened simply because she pays taxes when she purchases products rather than in connection with the ownership of property.

Tarrant County responds that neither Flowers nor Lara has standing as a taxpayer. First, it asserts that no authority supports Lara's contention that paying rent and sales tax confers taxpayer status. Second, the County contends that even if Lara is a taxpayer, neither she nor Flowers can prove that public funds are expended in operating the CEU. While we agree with the County that Lara is not a taxpayer for purposes of standing, we disagree that public funds are not expended in administering the CEU.

Whether Lara has taxpayer standing depends upon the type of tax she claims to have paid. Lara alleges that both her payment of rent on her Tarrant County residence and her payment of sales tax on the goods she purchases bestow taxpayer standing on her. We are unable to find any authority to support her contention that paying rent secures her status as a taxpayer. Lara is not liable to Tarrant County for the tax on the property she rents, and even if she presented proof that her landlord uses her rent to pay the tax, the connection between paying rent and her status as a taxpayer is too attenuated to confer taxpayer standing on her. We therefore decline to hold that paying rent confers taxpayer status.

Turning to Lara's argument that her payment of sales tax confers taxpayer standing, we first note that no Texas court has answered that question. Other jurisdictions, however, have held that merely paying sales tax does not confer taxpayer standing. *See Cornelius v. Los Angeles County Metro. Transp. Auth.,* 49 Cal. App.4th 1761, 57 Cal.Rptr.2d 618, 627–29 (1996) (payment of gasoline, sales, and state income taxes is insufficient to confer taxpayer standing); *Torres v. City of Yorba Linda,* 13 Cal.App.4th 1035, 17 Cal. Rptr.2d 400, 406–07 (993) (payment of sales tax is insufficient for standing); *Col-*

*lins v. State*, 750 A.2d 1257, 1261 (Me.2000) (payment of sales tax alone cannot confer standing); *Stumes v. Bloomberg*, 551 N.W.2d 590, 593–94 (S.D.1996) (absent ownership of property, paying sales tax did not make an inmate a taxpayer). In reaching this conclusion, these courts have determined, under their applicable state statutes, that a sales tax is imposed on the seller of goods, not on the purchaser. Thus they reason that although a retailer may pass the sales-tax cost on to the purchaser, paying sales tax cannot make a purchaser a taxpayer for purposes of standing. *See Cornelius*, 57 Cal.Rptr.2d at 628; *Torres*, 17 Cal.Rptr.2d at 407; *Collins*, 750 A.2d at 1261; *Stumes*, 551 N.W.2d at 593.

Texas law characterizes our state sales tax differently. Texas courts recognize that although sellers have the legal duty to collect sales tax from purchasers, *see* TEX. TAX CODE § 151.052, because it is a transaction tax, *see* TEX. TAX CODE § 151.051 (tax imposed on "each sale" of a taxable item), both sellers and purchasers are liable to the state for sales tax. *See Serna v. H.E. Butt Grocery Co.*, 21 S.W.3d 330, 333–34 (Tex.App.—San Antonio 1999, no pet.); *Rylander v. Associated Technics Co.*, 987 S.W.2d 947, 948 n. 6 (Tex.App.—Austin 1999, no pet.); *Davis v. State*, 904 S.W.2d 946, 952 (Tex.App.—Austin 1995, no writ); *Bullock v. Foley Bros. Dry Goods Corp.*, 802 S.W.2d 835, 838 (Tex. App.—Austin 1990, writ denied); *Bullock v. Delta Indus. Constr. Co.*, 668 S.W.2d 502, 504 (Tex.App.—Austin 1984, no writ). Therefore, in Texas, unlike the other jurisdictions discussed above, both sellers and purchasers are considered taxpayers. *See Davis*, 904 S.W.2d at 952. Despite this distinction, we are not persuaded that paying sales tax should be grounds for conferring taxpayer standing.

■ Taxpayer standing is a judicially created exception to the general standing rule. We have already limited the applicability of this exception by narrowly defining the type of action a taxpayer can maintain. A taxpayer may maintain an action solely to challenge proposed illegal expenditures; a taxpayer may not sue to recover funds previously expended, *Hoffman v. Davis*, 128 Tex. 503, 100 S.W.2d 94, 96 (1937), or challenge expenditures that are merely "unwise or indiscreet," *Osborne*, 177 S.W.2d at 200. Underpinning these limitations is the realization that " '[g]overnments cannot operate if every citizen who concludes that a public official has abused his discretion is granted the right to come into court and bring such official's public acts under judicial review'." *Bland*, 34 S.W.3d at 555 (quoting *Osborne*, 177 S.W.2d at 200). Extending taxpayer standing to those who pay only sales tax would mean that even a person who makes incidental purchases while temporarily in the state could maintain an action. This would eviscerate any limitation on taxpayer suits. It would allow a person with virtually no personal stake in how public funds are expended to come into court and bring the government's actions under judicial review. This is not what this Court envisioned in crafting the taxpayer-standing exception. *See Osborne*, 177 S.W.2d at 200. Accordingly, we hold, for prudential reasons, that paying sales tax does not confer taxpayer standing upon a party. Lara therefore does not have standing as a taxpayer to assert her claims.

■ In determining whether Flowers has taxpayer standing, we need not question whether he satisfies the taxpayer requirement; the parties do not dispute that Flowers is a Tarrant County resident who pays taxes on the property he owns. The dispositive issue regarding Flowers' standing is whether Tarrant County is actually

expending public funds in operating the CEU. Because this Court has yet to consider what constitutes expending public funds, we look for guidance to the more extensive jurisprudential experience of the federal courts.

Under federal law, taxpayer standing is divided into three categories—federal, state, and municipal—depending on which entity's expenditures are being challenged. To have standing to challenge a federal expenditure, taxpayers must establish a logical nexus between being a taxpayer and the type of action challenged, and demonstrate a link between their taxpayer status and the precise nature of the constitutional violation alleged. *See Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 479–80, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Flast v. Cohen,* 392 U.S. 83, 102–03, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). State taxpayer standing involves a similar test derived for the most part from *Doremus v. Board of Education,* 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952).[4] In that case, which involved allegations of both state and municipal taxpayer standing, the Court rejected the taxpayers' standing to challenge a state statute providing for the reading of Old Testament verses at the opening of each public-school day. The Court held that the plaintiffs had not shown "the requisite financial interest that [was], or [was] threatened to be, injured by the unconstitutional conduct." *Id.* at 435, 72 S.Ct. 394. The test

for municipal taxpayer standing, on the other hand, clearly involves less stringent requirements.[5] *See ASARCO Inc. v. Kadish,* 490 U.S. 605, 612, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989) (Kennedy, J.) (explaining that the relative closeness between municipalities and their taxpayers justifies a more lenient test for establishing municipal taxpayer standing than for establishing federal-taxpayer standing). Municipal taxpayers need only establish that they pay taxes to the relevant entity, and that public funds are expended on the ·allegedly unconstitutional activity. *See Massachusetts v. Mellon,* 262 U.S. 447, 486–87, 43 S.Ct. 597, 67 L.Ed. 1078 (1923); *ACLU–NJ v. Township of Wall,* 246 F.3d 258, 262–63 (3d Cir.2001); *Doe v. Madison Sch. Dist. No. 321,* 177 F.3d 789, 793–96 (9th Cir.1999); *Doe v. Duncanville Indep. Sch. Dist.,* 70 F.3d 402, 408 (5th Cir.1995); *Gonzales v. North Township of Lake County,* 4 F.3d 1412, 1416 (7th Cir.1993). Because these requirements mirror what is necessary to establish taxpayer standing in Texas, we look to the jurisprudence of municipal taxpayer standing to guide us in determining whether Tarrant County expends public funds in operating the CEU.

■ To be entitled to municipal taxpayer standing, a litigant must prove that the government is actually expending money on the activity that the taxpayer challenges; merely demonstrating that tax dollars are spent on something related to the allegedly illegal conduct is not enough.[6]

4. *See, e.g., Johnson v. Economic Dev. Corp.,* 241 F.3d 501, 507–08 (6th Cir.2001); *Koenick v. Felton,* 190 F.3d 259, 263 (4th Cir.1999); *Doe v. Madison Sch. Dist. No. 321,* 177 F.3d 789, 793–94 (9th Cir.1999); *see also Tarsney v. O'Keefe,* 225 F.3d 929, 940–41(8th Cir. 2000) (Magill, J., dissenting) (collecting cases).

5. *See, e.g., Board of Educ. v. New York State Teachers Ret. Sys.,* 60 F.3d 106, 110–11 (2d

Cir.1995); *Colorado Taxpayers Union, Inc. v. Romer,* 963 F.2d 1394, 1400–02 (10th Cir. 1992); *Cammack v. Waihee,* 932 F.2d 765, 770 (9th Cir.1991); *Taub v. Kentucky,* 842 F.2d 912, 918–19 (6th Cir.1988).

6. *See, e.g., Altman v. Bedford Cent. Sch. Dist.,* 245 F.3d 49, 74 (2d Cir.2001) (no taxpayer standing when plaintiffs failed to show "a measurable appropriation or loss of revenue attributable to the challenged activities");

The County alleges that the operation of the CEU does not satisfy this requirement because the money used to feed, clothe, and house the CEU inmates would be spent regardless of the CEU's existence. While we agree with the County's argument regarding these specific expenditures, we are convinced that other aspects of the CEU's operation involve the use of public funds.

The record establishes that the County uses tax dollars to manage the CEU. Although Don Anderson, a volunteer chaplain, directed the CEU's day-to-day operations, the record shows that Sheriff Williams and Chaplain Atwell—county-paid employees—spent a significant amount of county time overseeing and managing the CEU and its curriculum. Chaplain Atwell testified by deposition that he selected and monitored the CEU curriculum, and either approved or rejected any materials Anderson chose. He also testified that Anderson kept him apprised of the CEU's daily affairs, that Anderson submitted to his authority, and that "Anderson runs the CEU in accordance with [Atwell's] vision." Atwell further testified that he drafted the CEU inmate application form and submitted it to the district attorney's office for review. He interviewed the volunteer chaplains and then met weekly with them to discuss the CEU's progress, convey information, and advise them on how to handle problems. Atwell acknowledges that he reviewed the hours that the volunteers worked to determine if they were meeting their requirements, and had "ultimate authority to hire and dismiss" them. In fact, Atwell fired one volunteer chaplain "for not submitting to [his] authority."

Sheriff Williams was also involved in overseeing and managing the CEU and its curriculum. The sheriff's deposition testimony confirms that he met weekly with Atwell to review the CEU's activities, and that he required Atwell to discuss with him any significant decisions that could affect the CEU, including any changes to the curriculum. Sheriff Williams acknowledged that he held the power to veto, narrow, or broaden the teachings in the CEU, and thus in contrast to Chaplain Atwell, he could change a CEU policy without obtaining anyone's permission. Williams further testified that although "Atwell is responsible for maintaining the structure within the entire chaplaincy program," Atwell ultimately answered to the sheriff "with regard to all issues ongoing within the chaplaincy program, including Chaplain Anderson and all other volunteers that come in and minister." Finally, when asked if he considered it a sacrifice

*Madison Sch. Dist. No. 321,* 177 F.3d at 793–96 (no taxpayer standing to challenge a graduation prayer because spending tax dollars on renting a hall, printing programs, buying decorations, and hiring a security guard is necessary even if the ceremony does not include a prayer); *Duncanville Indep. Sch. Dist.,* 70 F.3d at 408 (no taxpayer standing to challenge Gideon Bible distribution at school when Gideons supply the Bibles and place them on a table, no school employees handle the Bibles, and there is no evidence that the school district bought the table for the Bible distribution); *Gonzales,* 4 F.3d at 1416 (no taxpayer standing to challenge a crucifix in a park when government money was not used to buy or maintain it, and although funds are spent maintaining the park, that cost would be incurred without the crucifix); *Friedmann v. Sheldon Cmty. Sch. Dist.,* 995 F.2d 802, 803 (8th Cir.1993) (no taxpayer standing to challenge a graduation prayer absent evidence that funds were spent on the invocation; mere funding of diplomas is insufficient); *Freedom from Religion Found., Inc. v. Zielke,* 845 F.2d 1463, 1470 (7th Cir.1988) ("The allegedly unconstitutional activity ... is the display ... of the Ten Commandments in Cameron Park, and the appellants concede that no tax money has been spent on this activity. Thus, Grams' possible status as a municipal taxpayer is irrelevant....").

of county time to have "Chaplain Atwell, or to the extent it's needed [himself], look at curriculum [and] evaluate instructors to make sure that the content of what's being taught is appropriate," Williams acknowledged that there was some sacrifice, though he did not believe that it was an "inordinate amount."

Both Sheriff Williams and Chaplain Atwell managed a religious program that involves numerous volunteers and hundreds of inmates. As the record shows, they selected the CEU curriculum, supervised the weekday volunteers, selected the volunteer chaplains, monitored the chaplains' hours and directed their activities, determined the requirements for inmate participation, met weekly to discuss the unit's affairs, and reviewed all information pertaining to the CEU. Based on their own testimony, we conclude that Sheriff Williams and Chaplain Atwell spent a significant amount of the County's time operating the CEU, including shaping and promoting its religious curriculum, and therefore that county funds were expended in operating the CEU.

■■■ In contrast to the cases that have deemed an employee's time an insufficient basis for standing,[7] Sheriff Williams and Chaplain Atwell's involvement with the CEU is anything but incidental. The record demonstrates that Sheriff Williams and Chaplain Atwell personally and directly operated and managed the CEU while on the county payroll. Moreover, although the sheriff and chaplain would be necessary employees even if the unit were not

part of the TCCC, that fact alone is insufficient to defeat taxpayer standing. *See Marsh v. Chambers*, 463 U.S. 783, 786 & n. 4, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (taxpayer had standing to challenge Nebraska's practice of opening each legislative day with a prayer; state-employed chaplain conducted the prayer and taxes were used to fund the chaplaincy). It would be illogical to conclude that standing exists if a county hires an employee to administer an illegal activity, but that it does not exist if an otherwise necessary employee spends significant time doing the administering. We conclude that Tarrant County is expending public funds in operating the CEU. Accordingly, because Flowers is a Tarrant County taxpayer, and because public funds are expended in running the CEU, we conclude that Flowers has standing as a taxpayer to seek injunctive relief. The County is therefore not entitled to summary judgment on the issue of Flowers' standing, and the court of appeals erred in concluding to the contrary.

### Standing as Inmates

Lara maintains that even if she does not have standing as a taxpayer, she has standing as a former TCCC inmate. Huff similarly alleges that as a former inmate, he has suffered an injury sufficiently particular to confer standing. They argue that they were emotionally harmed by the County's unwelcome unconstitutional establishment of religion. The court of appeals agreed that Lara and Huff have standing. It concluded that although they

7. *See ACLU–NJ*, 246 F.3d at 263–64 (taxpayers did not have standing because even if holiday display was erected by municipal employees, taxpayers produced no proof of more than de minimis expenditure by municipality); *Alabama Freethought Ass'n v. Moore*, 893 F.Supp. 1522, 1542–43 (N.D.Ala.1995) (proof that janitors occasionally dust plaque, or that a judge spends time uttering prayer, is insuffi-

cient for standing). *But see Harvey v. Cobb County*, 811 F.Supp. 669, 675–76 (N.D.Ga. 1993) (because county inmates moved a Ten Commandments panel to new location and crew cleaned it, county funds were expended, and thus plaintiff had taxpayer standing), *aff'd without opinion*, 15 F.3d 1097 (11th Cir. 1994).

have been released from the TCCC, because Lara and Huff may again find themselves incarcerated in the jail, their claims for injunctive and declaratory relief are not moot. 986 S.W.2d at 316.

Tarrant County disagrees. It emphasizes that because Lara and Huff are no longer TCCC inmates, they are not currently subject to the allegedly unconstitutional activity they seek to enjoin, and thus their claims for injunctive and declaratory relief are moot. The County contends that the court of appeals erred in concluding that because Lara and Huff may again find themselves incarcerated in the TCCC, they satisfy the "capable of repetition, yet evading review" exception to the mootness doctrine.

■■■■ For a plaintiff to have standing, a controversy must exist between the parties at every stage of the legal proceedings, including the appeal. *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 39, 71 S.Ct. 104, 95 L.Ed. 36 (1950). If a controversy ceases to exist—"the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome"—the case becomes moot. *Murphy v. Hunt*, 455 U.S. 478, 481, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982); *see also O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects."). If a case becomes moot, the parties lose standing to maintain their claims. *See generally City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *Murphy*, 455 U.S. at 481, 102 S.Ct. 1181. Because Lara and Huff have been released from jail, they lack a legally cognizable interest in obtaining injunctive or declaratory relief. They no longer face the unconstitutional conduct about which they complain, and thus any prospective relief we might grant cannot help them. Lara's and Huff's claims for injunctive and declaratory relief are therefore moot.

■■■■ Lara and Huff contend that even if their claims are moot, they fall under the "capable of repetition, yet evading review" exception to the mootness doctrine. We disagree. This exception applies only in rare circumstances. *See Lyons*, 461 U.S. at 109, 103 S.Ct. 1660. To invoke the exception, a plaintiff must prove that: (1) the challenged action was too short in duration to be litigated fully before the action ceased or expired; and (2) a reasonable expectation exists that the same complaining party will be subjected to the same action again. *See Murphy*, 455 U.S. at 482, 102 S.Ct. 1181; *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975); *Blum v. Lanier*, 997 S.W.2d 259, 264 (Tex.1999); *General Land Office v. OXY U.S.A., Inc.*, 789 S.W.2d 569, 571 (Tex.1990).

■■■■ The TCCC is a county jail facility where inmates serve sentences or await trial, transfer, or release. The duration of any inmate's stay, however, may be so short that it would be unlikely that any inmate would reside in the TCCC during the entirety of a legal proceeding challenging the existence of the CEU. Therefore, Lara's and Huff's claims meet the evading-review element of the mootness-exception test. *See Cox v. McCarthy*, 829 F.2d 800, 803 (9th Cir.1987); *Clark v. Brewer*, 776 F.2d 226, 229 (8th Cir.1985).

■■■■ Lara and Huff cannot, however, meet the capable-of-repetition element. Whether and when Lara and Huff may be charged with a crime that would lead to their incarceration in the TCCC is speculative. To conclude that there is a reasonable expectation that they will again

be subjected to the allegedly unconstitutional operation of the CEU requires us to assume that Lara and Huff will commit another crime. But Lara and Huff are required by law to prevent their own recidivism. *See O'Shea*, 414 U.S. at 497, 94 S.Ct. 669 ("We assume that [the plaintiffs] will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct said to be followed by [the defendants]."). Only by ignoring well-established precedent [8] can we conclude that Lara and Huff satisfy the "capable of repetition, yet evading review" exception to the mootness doctrine. Because we are unwilling to do so, we conclude that Lara's and Huff's claims for prospective relief are moot. Thus neither this Court nor the trial court has jurisdiction to render the injunctive and declaratory relief they seek. Accordingly, the County is entitled to summary judgment on Lara's and Huff's claims for injunctive and declaratory relief because Lara and Huff do not have standing to assert those claims. But Lara's and Huff's release from the TCCC does not render moot their claims for damages under section 1983. *See Lyons*, 461 U.S. at 105, 103 S.Ct. 1660; *Kerr v. Farrey*, 95 F.3d 472, 476 (7th Cir.1996); *Reimers*, 863 F.2d at 632.

Having concluded that each party has standing to pursue certain relief, we briefly clarify the issues we must address. As a taxpayer, Flowers has standing to seek declaratory and injunctive relief for the County's alleged violation of the Establishment Clause. Because Lara and Huff no longer reside in the TCCC, they lack standing for such relief under the Establishment, Free Exercise, and Equal Protection Clauses; those claims are moot. Lara, however, asserts claims for damages under 42 U.S.C. § 1983 for violations of the Establishment Clause, and Huff asserts claims for damages under 42 U.S.C. § 1983 for violations of his free-exercise rights; those claims are not moot. But while we must consider Flowers' and Lara's Establishment Clause claims and Huff's free-exercise claim, because no party with standing to do so seeks monetary relief for violations of the Equal Protection Clause, we cannot address the merits of the parties' equal-protection complaint. Rather, absent proof that any party has standing to pursue an equal-protection challenge, we must dismiss those claims for want of jurisdiction. *See Douglas v. Delp*, 987 S.W.2d 879, 882 (Tex.1999); *Texas Ass'n of Bus. v. Texas Air Control Bd.*,

---

**8.** *See, e.g., Lyons*, 461 U.S. at 105–10, 103 S.Ct. 1660 (it is presumed that plaintiff will follow the law); *Lane v. Williams*, 455 U.S. 624, 632–33 n. 13, 102 S.Ct. 1322, 71 L.Ed.2d 508 (1982) (plaintiffs required by law to prevent their own recidivism); *Weinstein*, 423 U.S. at 149, 96 S.Ct. 347 (once permanently paroled, there is no demonstrated probability that plaintiff will be subjected to the parole procedure again); *O'Shea*, 414 U.S. at 497, 94 S.Ct. 669 (it is presumed that plaintiffs will follow the law); *McAlpine v. Thompson*, 187 F.3d 1213, 1214 (10th Cir.1999)(prisoner's claim for mandamus relief is moot once he is placed on supervised release); *Hickman v. Missouri*, 144 F.3d 1141, 1143 (8th Cir.1998) (former inmates did not meet capable-of-repetition prong because they are required by law

to prevent their own recidivism); *Knox v. McGinnis*, 998 F.2d 1405, 1413–14 (7th Cir. 1993) (must assume that an inmate will abide by prison rules and will not be segregated again); *Reimers v. Oregon*, 863 F.2d 630, 632 (9th Cir.1988) (courts are reluctant to invoke this mootness exception when the possibility of reoccurrence depends on plaintiff's own wrongdoing); *Magee v. Waters*, 810 F.2d 451, 452 (4th Cir.1987) (prisoner's transfer moots his request for injunctive relief against the conditions of confinement in the facility from which he was transferred); *Beyah v. Coughlin*, 789 F.2d 986, 988 (2d Cir.1986) (same); *Ex parte Nelson*, 815 S.W.2d 737, 739 (Tex. Crim.App.1991) (refusing to assume that an inmate will again violate parole conditions).

852 S.W.2d 440, 443–45 (Tex.1993). We begin by examining Flowers' and Lara's Establishment Clause challenge.

### III. Establishment Clause

Our national Bill of Rights begins with the mandate: "Congress shall make no law respecting an establishment of religion...." U.S. CONST. amend. I. This mandate applies equally to the states and their political subdivisions through the Fourteenth Amendment. *See Everson v. Board of Educ.,* 330 U.S. 1, 8, 67 S.Ct. 504, 91 L.Ed. 711 (1947). Although the language of the Establishment Clause does not specify what conduct it prohibits, the Supreme Court has encapsulated its essential precepts in this often-quoted summary:

Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa.

*Everson,* 330 U.S. at 15–16, 67 S.Ct. 504; *see also County of Allegheny v. ACLU,* 492 U.S. 573, 591, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989); *School Dist. of Abington Township v. Schempp,* 374 U.S. 203, 216, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *Engel v. Vitale,* 370 U.S. 421, 430–31, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962).

Our state constitution guarantees protections similar to those provided by the federal constitution:

All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences. No man shall be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent. No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion, and no preference shall ever be given by law to any religious society or mode of worship. But it shall be the duty of the Legislature to pass such laws as may be necessary to protect equally every religious denomination in the peaceable enjoyment of its own mode of public worship.

TEX. CONST. art. I, § 6. In addition, article I, section 7 of the Texas Constitution states: "No money shall be appropriated, or drawn from the Treasury for the benefit of any sect, or religious society, theological or religious seminary; nor shall property belonging to the State be appropriated for any such purposes." TEX. CONST. art. I, § 7. Together, these provisions are considered Texas' equivalent of the Establishment Clause.

The plaintiffs contend that in creating and operating the CEU, Tarrant County has accomplished exactly what the Establishment Clauses of our state and federal constitutions seek to prevent: Tarrant County has effectively endorsed one religious view, and excluded all others. They contend the County has conveyed a message that nonadherents to the sheriff's and chaplain's personal religious views—those inmates who do not participate in the CEU program—are outsiders or second-class citizens. The plaintiffs urge that the

County's purpose in maintaining the CEU is suspect in that even Chaplain Atwell acknowledged that the County's goal of promoting rehabilitation and reducing violence could be accomplished through means other than instructing inmates in the principles espoused by the sheriff and chaplain. Finally, the plaintiffs insist that the ceaseless involvement of county employees in the CEU's operation excessively entangles the government with religion, a result they argue is unquestionably proscribed by Establishment Clause jurisprudence.

The County responds that the CEU's purpose is secular and that its operation is not unconstitutional. It asserts that the constitutional standard against which the CEU must be measured is whether its operation is reasonably related to a legitimate penological interest. Moreover, the County asserts that even if the standard is higher, operating the CEU neither impermissibly endorses religion nor excessively entangles the government with religion.

### Turner v. Safley

Before we can address whether the CEU is an unconstitutional establishment of religion, we must determine the appropriate standard against which to measure the County's actions. While this Court has not considered the standard for analyzing an inmate's constitutional challenge, our courts of appeals have. Those courts have relied on *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), in holding that a prison regulation is valid if it is reasonably related to legitimate penological interests.[9]

In *Turner*, the United States Supreme Court reviewed a challenge to two prison regulations. One limited correspondence between inmates at different institutions, while the other prohibited inmates from marrying absent the prison superintendent's permission. 482 U.S. at 81–82, 107 S.Ct. 2254. In examining the regulations, the Court articulated the proper standard for assessing the constitutionality of a prison regulation that allegedly violates an inmate's rights. Declining to engage in a strict-scrutiny analysis, the Court stated that a regulation is valid if it is "reasonably related to legitimate penological interests." *Id.* at 89, 107 S.Ct. 2254. The Supreme Court then identified factors relevant to determining the reasonableness of a regulation: (1) whether there is a rational relationship between the prison regulation and the governmental interest justifying it; (2) whether there are alternative means for exercising the right that are consistent with the prison setting; (3) the extent to which accommodating the right will affect other prisoners, guards, or the allocation of prison resources; and (4) the availability of ready alternatives that could accommodate the inmate's complaint. *Id.* at 89–90, 107 S.Ct. 2254. Applying these factors, the Court upheld the inmate-correspondence rule as being reasonably related to legitimate security interests, but struck down the marriage restriction as constituting "an exaggerated response to [the prison's] rehabilitation and security concerns." *Id.* at 91, 107 S.Ct. 2254.

Although the regulations at issue in *Turner* implicated the inmates' freedom-of-association and due-process rights, the Supreme Court has applied the *Turner* test to other alleged constitutional viola-

---

**9.** *See, e.g., Umar v. Scott*, 991 S.W.2d 512, 516 (Tex.App.—Fort Worth 1999, no pet.) (free-exercise claim); *Thomas v. Brown*, 927 S.W.2d 122, 126 (Tex.App.—Houston [14th Dist.] 1996, writ denied) (access to the courts); *Morris v. Collins*, 916 S.W.2d 527, 528 (Tex.App.—Houston [1st Dist.] 1995, no writ) (equal-rights amendment).

tions.[10] It has not, however, addressed whether *Turner*'s standard of review applies to an Establishment Clause complaint. Since *Turner* was decided, an overwhelming majority of the courts that have considered an inmate's Establishment Clause challenge have declined to apply *Turner* in assessing the constitutionality of a prison's actions.[11] For the reasons that follow, we similarly decline to apply *Turner* to an Establishment Clause claim.[12]

In adopting the *Turner* standard of review, the Supreme Court sought to ensure that even when the needs of prison administration implicate an inmate's constitutional rights, corrections officials retain the discretion to anticipate security problems and then adopt innovative solutions to those problems. *See id.* at 89, 107 S.Ct. 2254. Subjecting the day-to-day judgments of prison officials to an inflexible strict-scrutiny analysis would, according to the Court, "distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand." *Id.*

We agree that prison officials must have the discretion to deal effectively with the increasingly urgent problems of prison administration. The difficulties attendant to accommodating every inmate's free-exer-

---

**10.** *See, e.g., Shaw v. Murphy*, 532 U.S. 223, ———–———, 121 S.Ct. 1475, 1476–77, 149 L.Ed.2d 420 (2001) (applying *Turner* to claim that First Amendment provided enhanced protection to inmate-to-inmate communications containing legal advice); *Thornburgh v. Abbott*, 490 U.S. 401, 413–14, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (applying *Turner* to free-speech claims); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350–52, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (applying *Turner* to free-exercise claims); *see also Washington v. Harper*, 494 U.S. 210, 224, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (applying *Turner* to due-process claims).

**11.** *See, e.g., Kerr v. Farrey*, 95 F.3d 472, 476–80 (7th Cir.1996) (analyzing an Establishment Clause claim without applying *Turner*); *Muhammad v. City of N.Y. Dep't of Corrs.*, 904 F.Supp. 161, 195–99 (S.D.N.Y.1995) (applying *Turner* to free-exercise and equal-protection claims, but not to an Establishment Clause claim), *appeal dismissed as moot*, 126 F.3d 119 (2d Cir.1997); *Scarpino v. Grosshiem*, 852 F.Supp. 798, 804 (S.D.Iowa 1994) (explicitly stating *Turner* does not apply to an Establishment Clause claim); *Card v. Dugger*, 709 F.Supp. 1098, 1103–10 (M.D.Fla.1988) (applying *Turner* to a free-exercise claim but not an Establishment Clause claim), *aff'd*, 871 F.2d 1023 (11th Cir.1989); *see also* Apanovitch, Note, *Religion and Rehabilitation: The Requisition of God by the State*, 47 Duke L.J. 785, 822–36 (1998) (arguing that applying *Turner* to an Establishment Clause claim has a devastating effect). *But see Warburton v.*

*Underwood*, 2 F.Supp.2d 306, 316 (W.D.N.Y. 1998) (applying *Turner* to an Establishment Clause claim); *Boyd v. Coughlin*, 914 F.Supp. 828, 831–32 (N.D.N.Y.1996)(same).

**12.** Other courts have declined to apply *Turner* to other constitutional claims by inmates. *See, e.g., Jordan v. Gardner*, 986 F.2d 1521, 1530 (9th Cir.1993) (holding that *Turner* does not apply to Eighth Amendment claims); *Dunn v. White*, 880 F.2d 1188, 1194 n. 3 (10th Cir.1989) (questioning the application of *Turner* to Fourth Amendment claims); *Vigliotto v. Terry*, 873 F.2d 1201, 1203 (9th Cir.1989) (examining an Eighth Amendment claim without reference to *Turner*); *Pitts v. Thornburgh*, 866 F.2d 1450, 1453–56 (D.C.Cir.1989) (applying heightened scrutiny to an equal-protection claim and distinguishing *Turner*); *Austin v. Hopper*, 15 F.Supp.2d 1210, 1255 (M.D.Ala.1998) (declining to apply *Turner* to an Eighth Amendment claim); *Griffin v. Coughlin*, 743 F.Supp. 1006, 1010–19 (N.D.N.Y.1990) (applying *Turner* to equal-protection claim but not to an Eighth Amendment claim); *see also* Burke, Note, *Winning the Battle, Losing the War?: Judicial Scrutiny of Prisoners' Statutory Claims Under the Americans with Disabilities Act*, 98 Mich L.Rev. 482, 492 (1999) (recognizing that "despite the language used in *Turner* and its progeny, there is a fairly broad consensus that the *Turner* test should not apply in all constitutional rights cases").

cise request, or the security risk inherent in an inmate's desire to have contact visits, are readily apparent. But these concerns are less significant in connection with the Establishment Clause. An Establishment Clause inquiry focuses not on whether an inmate has a right to do something, but rather on whether the government should refrain from acting in a particular way. *See Scarpino v. Grosshiem,* 852 F.Supp. 798, 804 (S.D.Iowa 1994). In that context, the unique circumstances of imprisonment are of lesser relevance, and the risk that a court will improperly second-guess a prison official's judgment concerning prison administration or security is less of a concern. *See id.* We therefore hold that absent the policy concerns that prompted the Court in *Turner* to adopt its "reasonableness" test, applying the same standard of review to an inmate's Establishment Clause complaint is unjustified.[13] We thus will evaluate the County's operation of the CEU according to traditional Establishment Clause jurisprudence.

### Establishment Clause Jurisprudence

The Supreme Court has rejected any absolute approach in applying the Establishment Clause. At times it has relied on the principles enunciated in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), to guide it through this "extraordinarily sensitive area of constitutional law."[14] *Lemon,* 403 U.S. at 612, 91 S.Ct. 2105. Under *Lemon,* a government practice is constitutional if: (1) it has a secular purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not excessively entangle the government with religion. *Id.* at 612–13, 91 S.Ct. 2105. But the

---

**13.** *See Jordan,* 986 F.2d at 1530 (concluding that *Turner* has been applied only when a constitutional right may be limited because of the unique circumstances of imprisonment; because Eighth Amendment rights do not conflict with incarceration, *Turner* does not apply); *Thornburgh,* 866 F.2d at 1453–56 (suggesting that because general budget and policy choices do not involve the prison's daily operation, security, or inmate behavior, *Turner* should not apply); *Sturm v. Clark,* 835 F.2d 1009, 1013–14 (3d Cir.1987) (explaining that issue of whether attorneys can consult with clients at prison does not implicate prison's interest in deterring crime, encouraging rehabilitation, or ensuring security, and thus it should be evaluated under conventional First Amendment doctrine, not the less demanding *Turner* standard); *Lyon v. Vande Krol,* 940 F.Supp. 1433, 1438 (S.D.Iowa 1996) (stating that because the case involved a statute affecting prisoner litigation and court administration, it raised none of the concerns present in *Turner,* and thus the usual strict-scrutiny test should apply); *Scarpino,* 852 F.Supp. at 804–05 (explaining that when accommodation issues do not arise, Establishment Clause rights are not ones that may be limited because of imprisonment).

**14.** *See, e.g., Mitchell v. Helms,* 530 U.S. 793, 807–08, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000); *Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290, 314, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000); *Agostini v. Felton,* 521 U.S. 203, 218, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997); *Bowen v. Kendrick,* 487 U.S. 589, 602, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988); *Edwards v. Aguillard,* 482 U.S. 578, 583, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987); *Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S. 481, 484–85, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986); *Estate of Thornton v. Caldor, Inc.,* 472 U.S. 703, 708, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985); *Wallace v. Jaffree,* 472 U.S. 38, 55–56, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985); *Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 123, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982); *Stone v. Graham,* 449 U.S. 39, 40, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980); *Committee for Pub. Educ. & Religious Liberty v. Regan,* 444 U.S. 646, 653, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980); *Sloan v. Lemon,* 413 U.S. 825, 829–33, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973); *Committee for Pub. Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 772–73, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Hunt v. McNair,* 413 U.S. 734, 741, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973); *Levitt v. Committee for Pub. Educ. & Religious Liberty,* 413 U.S. 472, 481–82, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973).

*Lemon* test has been criticized by a majority of the current justices,[15] and the Court has used other analyses in attempting to achieve the First Amendment's underlying purpose. *See, e.g., Doe v. Beaumont Indep. Sch. Dist.,* 240 F.3d 462, 468 (5th Cir.2001) (observing that the Court has developed three lines of analysis for Establishment Clause claims); *Simmons–Harris v. Zelman,* 234 F.3d 945, 951–53 (6th Cir.2000) (recognizing that the Court "has not overturned or rescinded the *Lemon* test even as it has used its framework to shape differing analyses.").

■ What we can infer from the Supreme Court's evolving Establishment Clause jurisprudence is that at a minimum, "the Constitution guarantees that the government may not coerce anyone to support or participate in religion," *Lee v. Weisman,* 505 U.S. 577, 587, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), nor may the government appear "to take a position on questions of religious belief" or make " 'adherence to a religion relevant in any way to a person's standing in the political community.' " *Allegheny,* 492 U.S. at 592, 109 S.Ct. 3086 (quoting *Lynch,* 465 U.S. at 687, 104 S.Ct. 1355 (O'Connor, J., concurring)). In recent years, the Court has become particularly attuned to whether the challenged government practice purposefully or effectively "endorses" religion, an inquiry courts generally consider a component of the *Lemon* test's first and second parts. *Allegheny,* 492 U.S. at 592–94, 109 S.Ct. 3086; *Lynch,* 465 U.S. at 688–94, 104 S.Ct. 1355 (1984) (O'Connor, J., concurring); *Books,* 235 F.3d at 304–05; *Brooks v. City of Oak Ridge,* 222 F.3d 259, 264 (6th Cir.

2000); *Granzeier v. Middleton,* 173 F.3d 568, 572–73 (6th Cir.1999); *Cammack v. Waihee,* 932 F.2d 765, 773–80 (9th Cir. 1991).

■ Thus in determining whether the challenged government practice in this case violates the Establishment Clause, we begin by inquiring whether the purpose of the government's practice is legitimately secular, *Lemon,* 403 U.S. at 612, 91 S.Ct. 2105, that is, whether the actual intent of the government's action is to endorse or disapprove of religion. *See Stone v. Graham,* 449 U.S. 39, 41, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (concluding that the purpose behind posting the Ten Commandments on a school wall was not secular, regardless of claimed educational intent); *Abington,* 374 U.S. at 223–24, 83 S.Ct. 1560 (concluding that the purpose behind beginning the school day with Bible verses was not secular, despite claim that doing so promoted moral values). If both religious and secular objectives motivate the government's practice, the practice does not violate the Establishment Clause as long as the government's avowed purpose is sincere. *See Bowen v. Kendrick,* 487 U.S. 589, 602–03, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988); *Lynch,* 465 U.S. at 680 & n. 6, 104 S.Ct. 1355; *Cammack,* 932 F.2d at 773; *see also Santa Fe,* 530 U.S. at 308, 120 S.Ct. 2266 (explaining that while the government's characterization of its policy deserves deference, its stated purpose must not be a sham).

The County posits that the CEU curriculum promotes rehabilitation and reduces violence, which it alleges are the secular

**15.** *See, e.g., Santa Fe,* 530 U.S. at 319–20, 120 S.Ct. 2266 (Rehnquist, C.J., dissenting) (collecting cases); *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 398–99, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (Scalia, J., concurring); *Allegheny,* 492 U.S. at 655–56, 109 S.Ct. 3086 (Kennedy, J.,

concurring in part and dissenting in part); *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos,* 483 U.S. 327, 346–49, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987) (O'Connor, J., concurring); *Regan,* 444 U.S. at 671, 100 S.Ct. 840 (Stevens, J., dissenting).

purposes behind its operation. We recognize that prisons across this state face, among other problems, overcrowding, gang activity, and inmate violence, and thus we do not question whether the County is sincere in declaring that its actions are motivated by rehabilitation and security concerns, or that those concerns represent legitimate penological interests. Nor do we question whether the County could employ means other than the CEU curriculum to achieve these goals; even Chaplain Atwell conceded that it could. *See Lynch*, 465 U.S. at 681 n. 7, 104 S.Ct. 1355 (noting irrelevancy of whether nonreligious means could be used). *But see Abington*, 374 U.S. at 265, 83 S.Ct. 1560 (Brennan, J., concurring) (suggesting that government may not employ religious means without clearly demonstrating the insufficiency of nonreligious means). Indeed, we acknowledge that prison programs that involve religious instruction can comport with the Constitution. *See generally Lynch*, 465 U.S. at 672–73, 104 S.Ct. 1355 (acknowledging that a hermetic separation between government and religion is an impossibility that has never been required). In this case, evidence that Williams and Atwell intended to exclude other religious groups suggests that Williams' and Atwell's purpose was not only to promote religion, but to promote their own personal religious views. But there is also evidence that the County was motivated by legitimate penological concerns with rehabilitation and safety. Accordingly, we cannot conclude as a matter of law that the CEU had no legitimate secular purpose.

The propriety of the County's purpose does not, however, immunize its actions from further scrutiny. We must also consider whether its actions in fact convey a message that endorses or inhibits religion. *Lemon*, 403 U.S. at 612–13, 91 S.Ct. 2105; *accord Allegheny*, 492 U.S. at 594–95, 109 S.Ct. 3086; *Lynch*, 465 U.S. at 690, 104

S.Ct. 1355 (O'Connor, J., concurring). Sheriff Williams and Chaplain Atwell acknowledged that they were personally involved in selecting and screening the religious teachings offered in the CEU, not for penological reasons, but to ensure compliance with their own personal religious beliefs. In fact, Chaplain Atwell acknowledged that he had never considered allowing other religious views to be taught in the CEU. Sheriff Williams admitted to making "no bones about the fact that [he] applies the yardstick of [his] own belief system to what may permissibly go on in the CEU." He also conceded that denying the existence of the Holy Trinity would have been a sufficient reason for excluding certain instruction from being part of the CEU. Although Williams and Atwell expressed a willingness to allow representatives from other religions to instruct TCCC inmates, that instruction had to be based on the CEU curriculum; other religious instruction was prohibited. Williams' and Atwell's actions could be perceived as reflecting county endorsement of the specific religious content offered in the CEU.

 To contradict this appearance of religious endorsement, the County relies heavily on the fact that participation in the CEU is voluntary. Voluntariness, however, is not dispositive of the Establishment Clause claims in this case. The fact that participation in the CEU was voluntary does not detract from Williams' and Atwell's intention to allow only one religious viewpoint to be expressed. *Cf. Nyquist*, 413 U.S. at 786, 93 S.Ct. 2955 ("The absence of any element of coercion ... is irrelevant to questions arising under the Establishment Clause."); *Abington*, 374 U.S. at 223, 83 S.Ct. 1560 ("[A] violation of the Free Exercise Clause is predicated on coercion while the Establishment Clause violation need not be so attended....");

*Engel v. Vitale,* 370 U.S. 421, 430, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) ("The Establishment Clause, unlike the Free Exercise Clause, does not depend upon any showing of direct governmental compulsion...."). *But cf. Good News Club v. Milford Cent. Sch.,* — U.S. —, —, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) (holding that allowing religious club to meet in school facility would not create "valid Establishment Clause interest" for the school in part because "[t]he children cannot attend without their parents' permission, [and therefore] they cannot be coerced into engaging in [the club's] religious activities"); *Chaudhuri v. Tennessee,* 130 F.3d 232, 239 (6th Cir.1997) (upholding nonsectarian prayer or moment of silence at the beginning of certain meetings or ceremonies when an adult's attendance was voluntary); *Tanford v. Brand,* 104 F.3d 982, 985 (7th Cir. 1997) (same). Thus the fact that inmates were willing to submit to the instruction offered does not mean that Williams and Atwell did not promote their own personal religious beliefs over other religious teachings, and their official endorsement of the substance of the religious instruction offered in the CEU goes beyond what the Establishment Clause can tolerate.

▪ On this record, no fact issues exist that prevent us from concluding that the County's operation of the CEU endorses one religious view while excluding others, and thus conveys the impermissible message of official preference for one specific religious view. Providing moral guidance to inmates is certainly an important mission, and we recognize that hiring a chaplain may be necessary to secure prisoners' rights under the Free Exercise Clause. *See Abington,* 374 U.S. at 296–98, 83 S.Ct. 1560 (Brennan, J., concurring); *Theriault v. A Religious Office in the Structure of the Gov't,* 895 F.2d 104, 107 (2d Cir.1990). But the County cannot, consistent with the Establishment Clause, convey a message that endorses the personal religious beliefs of county officials in attempting to rehabilitate criminal offenders. Such an endorsement of religion is, by any test of which we are aware, unconstitutional.

## IV. Texas Constitution

Flowers and Lara also seek relief under the Establishment Clauses of our state constitution. TEX. CONST. art. I, §§ 6, 7. Because we have concluded that the operation of the CEU is unconstitutional under the United States Constitution, we need not consider these claims.

## V. Free Exercise Clause

Huff seeks monetary relief for the County's alleged violation of his free-exercise rights.[16] The First Amendment's Free Exercise Clause provides that Congress shall make no law "prohibiting the free exercise" of religion. U.S. CONST. amend. I. Huff, a Jehovah's Witness, maintains that by refusing his numerous requests for group discussion and instruction in his own faith, the County violated this First Amendment guarantee. He emphasizes that the denial of his request was based not on legitimate penological considerations, but rather on the sheriff's and chaplain's fear that these sessions would involve proselytizing beliefs with which they disagreed. The County responds that economic and security constraints prevented it from fulfilling Huff's request.

▪ Prisons cannot discriminate against inmates based on their religious preferences. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (holding that a prison could not

---

**16.** Lara does not contest the court of appeals' conclusion that her free-exercise and equal-protection rights were not violated as a matter of law.

deny a Buddhist inmate a reasonable opportunity to pursue his faith comparable to that afforded adherents of other religions); *Al–Alamin v. Gramley*, 926 F.2d 680, 686 (7th Cir.1991) ("The rights of inmates belonging to minority or non-traditional religions must be respected to the same degree as the rights of those belonging to larger and more traditional denominations."). But while inmates must be given a reasonable opportunity to exercise their religious freedom, the Constitution does not require prisons to provide every religious sect with a spiritual advisor. *See, e.g., Cruz*, 405 U.S. at 322 n. 2, 92 S.Ct. 1079; *Swoboda v. Dubach*, 992 F.2d 286, 290 (10th Cir.1993); *Blair–Bey v. Nix*, 963 F.2d 162, 163–64 (8th Cir.1992); *Tisdale v. Dobbs*, 807 F.2d 734, 740 (8th Cir.1986). Nor are prisons required to allow inmates to participate in unrestricted group worship. *See Anderson v. Angelone*, 123 F.3d 1197, 1198–99 (9th Cir.1997); *McCabe v. Arave*, 827 F.2d 634, 637 (9th Cir.1987); *Brown v. Johnson*, 743 F.2d 408, 412 (6th Cir.1984). Incarceration necessarily limits many of the privileges and rights available to nonprisoners. *See Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948). These restrictions arise both from the fact of incarceration and from the legitimate penological interests underlying the corrections system. *See id.*

 This is not to say that prison walls form a barrier separating inmates from all of the Constitution's protections. *See Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Under *Turner*, which the Supreme Court applies to inmates' free-exercise claims, a prison regulation that allegedly impinges upon a prisoner's free-exercise rights is valid if it is "reasonably related to legitimate penological interests." *Id.* at 89, 107 S.Ct. 2254; *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96

L.Ed.2d 282 (1987) (applying *Turner* to the Free Exercise Clause). The factors relevant to determining the reasonableness of a regulation are: (1) whether there is a rational relationship between the prison regulation and the governmental interest justifying it; (2) whether there are alternative means for exercising the right that are consistent with the prison setting; (3) the extent to which accommodating the right will impact other prisoners, guards, or the allocation of prison resources; and (4) the availability of ready alternatives that could accommodate the inmate's complaint. *Turner*, 482 U.S. at 89–90, 107 S.Ct. 2254.

Using this analytical framework as our guide, we first note our disagreement with the court of appeals' review of the record. Our review of the evidence does not reveal exactly what type of religious accommodation Huff requested. While Huff's briefs and the court of appeals' opinion frame Huff's request in terms of allowing Jehovah's Witnesses to participate in group worship, the record does not make apparent whether Huff sought a CEU-type environment or merely one similar to that afforded inmates in the Tuesday night service, during which the jail's general population may participate in CEU-curriculum-based group study and prayer. Nor is the record clear about why the jail denied Huff's request. While the evidence supports Huff's contention that the sheriff and chaplain did so because they feared that the Jehovah's Witnesses would proselytize, it does not support the County's contention that it denied Huff's request for economic and security reasons. Although the County's purported economic and security reasons do represent legitimate penological interests, based on the record before us we cannot determine whether those reasons actually motivated the County's decision. *See O'Lone*, 482 U.S. at 348, 107 S.Ct. 2400; *Turner*, 482 U.S. at 90, 107 S.Ct.

2254. Because the evidence does not conclusively establish what Huff requested and why his request was denied, we cannot conclude, as a matter of law, that Huff's free-exercise rights were not violated. The court of appeals therefore erred in affirming summary judgment for the County on Huff's free-exercise claim. Huff is similarly not entitled to summary judgment on this record, and we remand his free-exercise claim to the trial court.

## VI. Section 1983

 Lara and Huff contend that even if their claims for injunctive and declaratory relief are moot, they have claims against Tarrant County for damages under 42 U.S.C. § 1983.[17] A municipality may be liable for damages under section 1983 if its policy or custom caused a constitutional injury. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). While Lara bases her section 1983 claim on the County's violation of the Establishment Clause, Huff claims he is entitled to damages for the County's violations of the Free Exercise Clause. The court of appeals concluded that because the County established that as a matter of law Huff's free-exercise rights were not violated, he did not state a viable section 1983 claim. 986 S.W.2d at 323. Similarly, it concluded that because Lara did not prove that any alleged emotional distress caused by the County's operation of the CEU rose to the level of a constitutional violation, she too did not state a viable section 1983 claim. *Id.* We disagree with both conclusions.

 Whether Tarrant County's actions caused Lara emotional distress goes not to the viability of her claim under section 1983 for an Establishment Clause violation, but rather to the amount of damages, if any, she may recover. Upon proper proof a plaintiff may recover compensatory damages for emotional distress under section 1983. *See Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306-07, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986); *Carey v. Piphus*, 435 U.S. 247, 264, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Because we have concluded that the County's operation of the CEU violated the Establishment Clause, Lara has presented a claim under section 1983. In addition, because we are remanding Huff's free-exercise claim to the trial court, his ability to maintain that claim under section 1983 is once again an issue for that court.

## VII. Conclusion

Tarrant County's operation of the Chaplain's Education Unit so as to endorse one religion over other religions or nonreligion conveyed the impermissible message that the County preferred the personal religious views of the sheriff and chaplain over other views. This official endorsement of religion is, as a matter of law, unconstitutional. The trial court should determine whether injunctive relief, as sought by Flowers, is appropriate, and whether Lara is entitled to damages under section 1983 because of this constitutional violation. The record in this case precludes us, however, from determining whether Huff's free-exercise rights were violated as a matter of law. And no party has standing to pursue the equal-protection claims presented here. We therefore vacate in part

---

**17.** "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

and reverse in part the court of appeals' judgment, dismiss for want of jurisdiction the equal-protection claims, render judgment declaring the operation of the Chaplain's Education Unit unconstitutional, and remand the remaining claims to the trial court for further proceedings consistent with this opinion.