**Opinion issued December 13, 2016**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-16-00491-CV

## NO. 01-16-00535-CV

_____

## IN THE INTEREST OF J.R. & M.D.N.S.T., CHILDREN

On Appeal from the 314th District Court
Harris County, Texas
Trial Court Case No. 2011-00781J

## MEMORANDUM OPINION

The trial court terminated the parental rights of John and Mary's parents.[1] L.S., who is the mother of both children, appeals. J.T., who is Mary's father, also appeals. M.R., who is John's father, has not appealed.

L.S. ("Mother") contends that the trial court lacked subject-matter jurisdiction to adjudicate her parental rights. Additionally, she argues that the trial court lacked the ability to modify the conservatorship because there had not been a material and substantial change in circumstances since the last conservatorship order. Finally, she contends that the evidence was legally and factually insufficient to support termination under any of the three grounds listed in the termination order and the trial court's best-interest finding.

J.T. ("Father") contends that the evidence was legally and factually insufficient to support termination under any of the three grounds listed in his termination order and the trial court's finding that termination of his parental rights was in Mary's best interest.

We affirm.

## Background

John and Mary were removed from Mother's care in 2011 due to "concerns of physical neglect and failure to thrive." In February 2012, their maternal great-

---

[1] J.R. will be referred to as John, and M.D.N.S.T. will be referred to as Mary, both for their privacy and for ease of reading.

2

aunt was named their sole managing conservator, and Mother was named possessory conservator. Before the order confirming the great-aunt's conservatorship was entered, she returned the children to Mother.

The Department of Family and Protective Services filed an emergency motion seeking to modify conservatorship. The supporting affidavit stated that the great-aunt had informed the Department that she "only wanted to keep the children temporarily" and, therefore, gave them back to Mother. The affidavit asserted that Mother had severe depression, was not taking prescribed medications, recently demonstrated "inappropriate parenting skills (including poor judgment and decision-making skills) and mental instability," and was homeless. Finally, the affidavit stated that there was "a present and continuing danger of neglectful supervision and physical neglect" of both children if they remained in Mother's care.

The trial court entered an order in March 2012, in response to the Department's emergency motion, naming the Department as temporary managing conservator of both children. Around that same time, Mother agreed to a Family Plan of Service, which asked her to complete counseling, obtain stable housing, and take various other actions to provide a safe environment for her children.

3

The fathers of both children were in jail at the time of the emergency modification of conservatorship. Without a parent or other identified relative to care for the children, both were placed in foster care.

Over the next two years, the Department moved the children several times to different foster care homes and facilities in an effort to address their behavior issues and accompanying needs. Both children were developmentally delayed, and John had cognitive deficits and uncontrolled aggression towards caregivers. Child Advocate reports filed with the court over the two-year period indicated that Mother continued to be unable to provide a safe and stable environment for her children or to deal with the children's special needs.

In April 2014, the trial court entered an "Agreed Order Modifying Prior Order and Decree in Suit Affecting the Parent-Child Relationship." The order stated that circumstances had substantially and materially changed since the February 2012 order that named the children's great-aunt as their sole managing conservator. The agreed order modified that order by removing the great-aunt as conservator, naming the Department as sole managing conservator of both John and Mary, naming Mother as possessory conservator of both John and Mary,

naming Father as possessory conservator of Mary, and, finally, naming John's father as possessory conservator of him.[2]

One month after the agreed order was entered, Father was released from prison. Seven months later, in December 2014, he entered into a family service plan. The plan required Father to participate in a psycho-social assessment, follow all recommendations of the therapist, maintain contact with his caseworker, provide and maintain a stable home, not reside with anyone who has not been approved by the Department, attend all court hearings and visits with Mary, and complete a parenting course.

In January 2015, Mother entered into a new family service plan. The plan required Mother to pay child support, maintain contact with her caseworker, complete a mental health evaluation, maintain a stable home environment, complete a special needs parenting course, take medications prescribed for her depression diagnosis, and make reasonable efforts to attend meetings, visits, and hearings.

Both Mother and Father signed their plans and acknowledged that they understood their contents, which included warnings that, if the parent is "unwilling

---

[2]   There is no reference in the agreed order to the more recent order, entered in March 2012, that named the Department as temporary managing conservator in response to the Department's emergency motion.

5

or unable to provide [the parent's] child with a safe environment, [the parent's] parental and custodial duties and rights may be restricted or terminated . . . ."

Four months later, in May 2015, the trial court entered an order requiring Mother and Father to successfully complete their family service plans by January 21, 2016. The order advises that failure to complete the plans could result in termination of their parental rights. After that deadline passed, the Department filed an amended motion to modify conservatorship that sought termination of all parents' parental rights. The trial was held in May 2016.

At trial, the Department's caseworker, C. Wilson, testified regarding the parents' lack of compliance with their family service plans. She testified that Mother had not completed "anything" on her plan, had not paid any of the court-ordered child support, and had been inconsistent with her scheduled visits with the children. Despite being given "several years" to demonstrate an ability to provide stability and consistency, Wilson testified that Mother failed to do so. She recommended termination of Mother's parental rights.

Wilson testified that Father also had not completed any of his family service plan requirements by the January 2016 deadline. He was given an extension by the Department, and, post-deadline, he did undertake some of his plan requirements. But given his late start, he had not completed everything by the trial date. Specifically, he only attended one of six therapy sessions.

6

The Department also presented evidence of Father's violent criminal history. He had two felony assault convictions, both of which involved deadly weapons. The first conviction was from 2000. The second was from 2012 and was for assault of a family member—his ex-wife. Wilson testified that Father also had assaulted Mother in the past. Finally, there was evidence of a 2010 conviction for misdemeanor theft.

Wilson testified about Father's home environment. While she described his housing as "stable," she noted that he shared his home with his girlfriend and their newborn child. Father's family service plan required him to refrain from living with anyone who could not pass a background check and had not received Department approval. Wilson testified that Father failed to disclose to the Department that both he and his live-in girlfriend had separate Department investigations into their parenting.

Wilson recommended terminating Father's parental rights to Mary due to his violent history, a pattern of assaulting the women in his life, and his failure to complete his service plan, including individual therapy.

Wilson also testified about the children. John (age 12) and Mary (age 5) resided in separate foster care facilities due to their behavioral issues. Various progress reports presented to the trial court detailed extreme behavioral issues for

7

both children in the beginning of their time in foster care; both were considered to have "special needs." But both improved over time.

In the beginning, John was diagnosed with autism and bipolar disorder, but he improved over the four years that he received medical intervention while in the Department's care, which resulted in those two diagnoses being removed. Other negative medical findings remained, though, including ADHD, mood disorder, and fetal alcohol syndrome. Department records noted that John had limited cognition and attended Special Education classes. According to Wilson, termination was in John's best interest because the Department had encountered difficulty searching locally for a potential permanent placement that could address his special needs and, following termination, it could conduct a much broader, nationwide search.

According to Wilson, Mary showed considerable improvement during the four years that she was in the Department's care. The Department no longer considered her as a "special needs" placement and believed that she was ready for a permanent, adoptive home. Wilson testified that termination was in Mary's best interest because she had been in foster care for the majority of her life and needed the stability and consistency of a permanent home. Four adoptive families had recently inquired about Mary, which was more interest than had been shown in the past. The Department planned to study those four homes to find the best match for Mary.

Mother did not attend the trial.[3] She did not testify. Nor did she present any evidence to dispute the caseworker's testimony.

Father testified that he wished to parent Mary. He stated that he was released from prison for his most recent assault charge two years earlier and, in those two years, he had visited Mary eight to ten times. He attributed his missed visits to scheduling conflicts and his own work conflicts; however, he acknowledged that he did not begin his job until two months before the trial date. He did not pay any child support during the two years that he was out of prison.

Father testified that his failure to complete therapy was the result of the Department not authorizing payment for the therapy, not his unwillingness to go. In response, the Department established that Father did not begin the process of fulfilling his plan requirements until after the court-ordered deadline had passed. Thus, his payment authorization for therapy services had expired, been renewed, and expired a second time before he tried to use it.

Father and Mary held their visits at a McDonald's restaurant. Father testified that he would buy Mary food during their visits, but he agreed that he never brought any items with him to support their interaction, like books or games. There

---

[3]  Mother appeared through her attorney. The attorney asked for a continuance at the beginning of trial because Mother contacted her one day earlier and said that she was going to the emergency room due to chest pains. After receiving information that Mother had not been in contact with her attorney since that communication, the trial court denied the continuance. No party appeals that ruling.

was no evidence that he ever brought her personal items for her to keep either. Nor did he, according to the caseworker, ever send Mary birthday cards or gifts or acknowledge other holidays or family events during those two years.

The trial court terminated Mother's parental rights as to both children based on the findings that she violated Subsections (F) (failure to support), (N) (constructive abandonment), and (O) (failure to comply with court-ordered plan) of Section 161.001(b)(1) of the Family Code and that termination was in the children's best interest. It terminated Father's parental rights as to Mary based on the findings that he violated Subsections (E) (engaging in conduct that endangers), (N) (constructive abandonment), and (O) (failure to comply with court-ordered plan) of the statute and that termination was in Mary's best interest. It terminated John's father's parental rights under Subsection (K) (voluntary relinquishment) and on the finding that termination was in John's best interest.

Mother and Father appeal.

**Standard of Review**

A parent's right to the "companionship, care, custody, and management" of his or her child is a constitutional interest that is "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). A termination decree is final, irrevocable, and permanently divests the parent of all legal rights, privileges,

duties, and powers with respect to the parent-child relationship except for the child's right to inherit. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Id.* But "the rights of natural parents are not absolute," and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994). Recognizing that a parent may forfeit parental rights by acts or omissions, the primary focus of a termination suit is protection of the child's best interests. *Id.*; *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003).

The burden of proof in termination cases is "clear and convincing evidence." TEX. FAM. CODE ANN. § 161.001(b); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007. This is an intermediate standard that falls between the "preponderance of the evidence" standard used in ordinary civil proceedings and the "reasonable doubt" standard used in criminal proceedings. *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979).

When the legal sufficiency of the evidence supporting termination of parental rights is challenged, the reviewing court looks at all the evidence in the

light most favorable to the termination finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *In re J.F.C.*, 96 S.W.3d at 265–66. The court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *In re J.O.A.*, 283 S.W.3d at 344. It should disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *Id.* If, after conducting a legal-sufficiency review of the record evidence, the court determines that no reasonable factfinder could have formed a firm belief or conviction that the matter to be proved was true, the court must conclude that the evidence on that matter is legally insufficient. *Id.*

Only when the factual sufficiency of the evidence is challenged does the reviewing court review disputed or conflicting evidence. *Id.* at 345. The evidence is factually insufficient in a termination suit if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of its finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction that the matter to be proven was true. *Id.* The court of appeals should "explain in its opinion 'why it has concluded that a reasonable factfinder could not have credited disputed evidence in favor of the finding.'" *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 267).

A single predicate finding under Section 161.001(b)(1) of the Family Code is sufficient to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). If a trial court lists multiple statutory grounds for termination in its order and we affirm on one of those grounds, we need not consider the remaining grounds. *See In re T.G.R.-M.*, 404 S.W.3d 7, 16 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

**Mother's Parental Rights**

Mother argues that there is legal and factually insufficient evidence to support (1) a finding that circumstances had substantially and materially changed to permit modification of conservatorship, (2) termination of her parental rights under any of the three subsections specified in the termination order, or (3) the trial court's finding that termination was in the children's best interest. Mother also raises a jurisdictional argument, which we must address first.

A. **Subject-Matter Jurisdiction**

In her first issue, Mother contends that the trial court lacked subject-matter jurisdiction because the subject of the suit had become moot. Her mootness argument has three parts. First, Mother contends that the Department's motion to modify sought to modify a "dead order" because it referenced an earlier-in-time,

13

February 2012[4] order, instead of the trial court's most recent order, the April 2014 agreed order.

Her next two arguments, which seem to be made in the alternative, address the fact that the affidavit attached to the Department's most recently amended motion to modify is the same affidavit the Department used to support issuance of temporary orders in March 2012. Mother argues that the Department's reliance on the affidavit in 2012 meant that the "affidavit is moot" for purposes of termination in 2016. She also argues that the doctrine of res judicata prohibits relying on the affidavit in both proceedings.

Mother synthesizes her three jurisdictional arguments into the following assertion: "[T]he Department's Fifth Amended Motion attempts to improperly modify a dead order and does not contain a live controversy. The Department's motion is moot and fails to meet subject-matter jurisdictional requirements."

1. **Standard of review and applicable law**

Subject-matter jurisdiction is essential to a court's power to decide a case. *City of Houston v. Rhule*, 417 S.W.3d 440, 442 (Tex. 2013). A court that acts without subject-matter jurisdiction commits fundamental error that may be

---

[4] The motion says that the order seeking to be modified was dated February 23, 2013. This appears to be a typographical error. The court entered an order on February 23, 2012, not 2013. The Department correctly identified the date of this order in earlier modification motions, but identified the date incorrectly in its fifth amended motion. Mother raises the discrepancy but concedes that the error is typographical.

14

reviewed for the first time on appeal. *Id.* Whether a court has subject-matter jurisdiction is a question of law that we review de novo. *Id.* In performing our review, we do not look to the merits of the plaintiff's case; instead, we consider only the pleadings and the evidence pertinent to the jurisdictional inquiry. *See Tex. Dep't of Parks and Wildlife v. Miranda*, 133 S.W.3d 217, 226–27 (Tex. 2004). We construe the pleadings liberally in favor of the plaintiff. *Id.* A judgment is void if rendered by a court without subject-matter jurisdiction. *In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 309 (Tex. 2010) (orig. proceeding); *King v. Deutsche Bank Nat'l Trust Co.*, 472 S.W.3d 848, 851 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

Subject-matter jurisdiction exists "when the nature of the case falls within a general category of cases the court is empowered, under applicable statutory and constitutional provisions, to adjudicate." *Bullock v. Briggs*, 623 S.W.2d 508, 511 (Tex. App.—Austin 1981, writ ref'd n.r.e.). Standing is a prerequisite to subject-matter jurisdiction. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 553–54 (Tex. 2000). Standing requires "a real controversy between the parties" that is capable of being "actually determined by the judicial declaration sought." *Brown v. Todd*, 53 S.W.3d 297, 305 (Tex. 2001) (quoting *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 517–18 (Tex. 1995)). For a plaintiff to have standing, a controversy must exist between the parties at every stage of the legal proceedings.

15

*Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001). If a controversy ceases to exist, the case becomes moot and the parties lose standing to maintain their claims. *Id.*

### 2. The trial court had subject-matter jurisdiction

In April 2014, the trial court entered a "final" agreed order that removed the great-aunt as managing conservator, named the Department sole managing conservator, and named all three parents possessory conservators of their respective children. That final order established the issuing trial court's exclusive and continuing jurisdiction. *See* TEX. FAM. CODE ANN. § 155.001(a).

In January 2015, Mother entered into an agreed family service plan that the trial court ordered her to complete by January 2016 or potentially have her parental rights terminated. In May 2016, the Department filed its "Fifth Amended Motion to Modify for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship." Through this motion, the Department sought to terminate Mother's parental rights, asserting, among other things, that circumstances had materially and substantially changed and that she had failed to comply with the court-ordered family service plan by the deadline.

The trial court had subject-matter jurisdiction to adjudicate Mother's parental rights for failure to comply with the court-ordered family service plan. *See* TEX. FAM. CODE ANN. §§ 155.001–.003 (exercise of continuing, exclusive jurisdiction to modify conservatorship); 161.001(b) (authority to terminate parent-

16

child relationship); *cf. In re J.D.C.*, No. 12-03-00262-CV, 2005 WL 110342, at *1–2 (Tex. App.—Tyler Jan. 19, 2005, no pet.) (mem. op.) (rejecting argument that court had no subject-matter jurisdiction and holding that earlier order established court's continuing, exclusive jurisdiction, thereby conferring jurisdiction on court to modify conservatorship through subsequent order).

Mother argues that the court nevertheless lacked jurisdiction because the motion to terminate did not seek to modify the trial court's most recent order—the April 2014 agreed order—but, instead, an earlier "dead order." The Department's motion does not reference the most recent order, but it otherwise correctly identifies the cause number assigned to the case, the parents, and the children who were subject to the trial court's continuing jurisdiction.

Mother cites no authority to support her argument that a mistaken reference to an order other than the most recently entered order, in a motion to terminate parental rights, creates a jurisdictional defect that destroys subject-matter jurisdiction over the care and protection of children within the trial court's continuing jurisdiction. *See* TEX. R. APP. P. 38.1(i) (requiring brief to contain appropriate citations to authorities and to the record). Nor do we find case law to support her assertion. We conclude that a court that has continuing subject-matter jurisdiction does not somehow lose jurisdiction through a party's reference to an order that is not the court's most recent conservatorship order.

Likewise, Mother cites no authority to support her argument that attachment of an affidavit with four-year-old information about the parent-child relationship destroys subject-matter jurisdiction due to "mootness" of that affidavit. *See id.* Four-year-old information may or may not provide support for terminating a parent's rights, but that argument raises an evidentiary-sufficiency issue, not a jurisdictional one. *Cf. Jordan v. Dossey*, 325 S.W.3d 700, 726 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (weighing evidence of past parental shortcomings against more recent improvements).

Mother's final argument is that, once the trial court relied on the Department's affidavit to determine emergency conservatorship over her children in 2013, the affidavit was subject to res judicata and unavailable to support later termination in 2016. Res judicata is an affirmative defense that is subject to waiver. *See Whallon v. City of Houston*, 462 S.W.3d 146, 155 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). Nowhere in the record is there any indication that Mother presented the trial court with her res judicata argument; as a result, the argument is waived. TEX. R. APP. P. 33.1(a); *Whallon*, 462 S.W.3d at 155. Regardless, the issue of whether res judicata should have applied to prevent remote facts and accusations from supporting trial court action does not raise a jurisdictional issue. *See Whallon*, 462 S.W.3d at 155 ("Res judicata does not implicate subject-matter jurisdiction.").

18

Because the trial court had continuing jurisdiction under the Family Code and Mother's arguments contesting subject-matter jurisdiction are unavailing, we overrule her first issue.

## B.     Material and substantial change in circumstances

In her second issue, Mother argues that Section 156.101 of the Family Code authorizes the trial court to modify conservatorship only if circumstances have substantially and materially changed since the date of the last conservatorship order. She contends that "the evidence is legally and factually insufficient to establish grounds to modify an order of conservatorship based on a material and substantial change of circumstances" since the April 2014 agreed order. She concludes that, absent such evidence, the trial court was not statutorily authorized to terminate her parental rights.

Our analysis of this argument is strongly guided by an earlier opinion of our sister court, *In re C.A.C.*, No. 14-12-00396-CV, 2012 WL 4465234 (Tex. App.—Houston [14th Dist.] Sept. 27, 2012, no pet.) (mem. op.). There, a father appealed the termination of his parental rights and argued that the Department had failed to demonstrate a material and substantial change of circumstances since the date of an earlier conservatorship order, which he maintained the Department was required to show under Section 156.101. *Id.* at *7.

The appellate court first noted that the Family Code has a group of provisions addressing conservatorship modification that is separate and distinct from another group of provisions addressing parental-rights termination. *Id.* at *7–8. Section 156.101 is in the area of the Code addressing modifications, not termination proceedings like the one the father appealed. *See id.*; *see also In re A.M.*, 451 S.W.3d 858, 860–61 (Tex. App.—Dallas 2014, no pet.). Even though the father did not cite to it, the court considered whether the parallel provision found in the area of the Code addressing terminations—Section 161.004—required evidence of a material and substantial change before the father's parental rights could be terminated. *In re C.A.C.*, 2012 WL 4465234, at *8–9 & n.8. We will do the same and address whether Section 161.004 required evidence of a substantial and material change of circumstances to terminate Mother's parental rights, even though Mother cited only to Section 156.101.

Section 161.004 provides that a court may terminate the parent-child relationship "after rendition of an order that previously denied termination of the parent-child relationship" if the circumstances of the child, parent, or a conservator have materially and substantially changed "since the date that the order was rendered," the petition to terminate is filed after the previous denial order was rendered, the parent committed an act that is grounds for termination under Section

20

161.001 before the date the order denying termination was rendered, and termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.004(a).

Anticipating that this Court might analyze Mother's argument under Section 161.004, the Department argues that Section 161.004 does not apply because the April 2014 order did not expressly deny a request to terminate Mother's parental rights; instead, it named the Department as sole managing conservator and the parents as possessory conservators with no mention of termination. The order did, however, contain a "Mother Hubbard" clause, stating, "It is ordered and decreed that all relief requested in this case and not expressly granted is denied."

*In re C.A.C.* rejected very similar arguments. There, the Department filed a petition seeking to be named temporary sole managing conservator of the affected children and for termination of the father's parental rights. 2012 WL 4465234, at *1. The trial court entered a final decree that named the Department as sole managing conservator and the mother as possessory conservator. *Id.* Without expressly granting or denying the Department's motion to terminate the father's parental rights, the decree denied the father access or possession of the children as a result of the court's best-interest finding. *Id.* Later, the children were removed from a relative's home, and the Department moved to terminate the father's parental rights. *Id.* The Department argued that Section 161.004 did not apply because the earlier decree did not expressly deny termination even though it

21

contained a "Mother Hubbard" clause stating "that all relief requested in this case and not expressly granted is denied." *Id.* at \*8. The appellate court disagreed, holding that the earlier decree "operated to deny the Department's prior request to terminate Father's parental rights" in that it was entered in response to a motion to terminate. *Id.* at \*8–9 & n.6.

Again following *In re C.A.C.*, we conclude that the April 2014 agreed order, which contained a Mother Hubbard clause, operated as a denial of termination because the Department had moved for termination in its earlier motion. *See id.* Next, we consider whether there was legally and factually sufficient evidence of a material and substantial change in circumstances.

The April 2014 agreed order named the Department as the children's permanent sole managing conservator and the parents as possessory conservators of their respective children. Later, Mother entered into a family service plan, and the trial court ordered her to complete the plan requirements by January 2016 or potentially face termination of her parental rights. According to the trial testimony of the Department's caseworker, Wilson, the deadline passed without Mother completing any of the plan's requirements. Mother presented no evidence to dispute Wilson's testimony.

When a parent fails to do even one service mandated by court order as a prerequisite to reunification with a child, the resulting determination by the

Department that its focus must shift from reunification to adoption is a material and substantial change in the parent's circumstances. *See In re J.R.*, No. 07-12-00003-CV, 2012 WL 1605738, at *4–5 (Tex. App.—Amarillo May 8, 2012, no pet.) (mem. op.) (concluding that parents' failure to engage in service plan or demonstrate cooperation with Department evidenced material and substantial change in parents' circumstances under Section 161.004).

We conclude that Mother's failure to complete any of her plan by the court-ordered deadline provided legally and factually sufficient evidence from which the trial court could have formed a firm belief or conviction that there had been a material and substantial change in Mother's circumstances since the rendition of the April 2014 order. We overrule her second issue. We turn now to the sufficiency of the evidence supporting termination.

## C.    Legal and factual sufficiency of evidence

Mother challenges the legal and factual sufficiency of the evidence to support each of the three bases for termination included in the termination order and the trial court's best-interest finding. We consider first the statutory grounds for termination.

### 1.    Termination under Subsection (O)

An individual's parental rights may be terminated under Subsection (O) if (1) the Department has been the child's temporary or permanent managing

conservator for at least nine months, (2) the Department took custody of the child as a result of an emergency removal for child abuse or neglect, (3) a court issued an order establishing the actions necessary for the parent to obtain the return of the child, and (4) the parent did not comply with the court order. TEX. FAM. CODE ANN. § 161.001(b)(1)(O); *In re S.M.R.*, 434 S.W.3d 576, 582 (Tex. 2014).

The trial court ordered Mother to comply with her family service plan, which specified the following tasks: pay child support; maintain contact with her caseworker; complete a mental health evaluation and follow any recommendations received; maintain a stable home environment and provide necessary documentation; complete a special-needs parenting course and provide documentation; make reasonable efforts to attend meetings, visits, and hearings; and follow through with all medication relating to her diagnosis of depression. The stated goals of the plan included Mother demonstrating an ability to provide for the special needs of the children and maintaining safe housing for the children.

The Department caseworker testified that Mother failed to complete even one item from her family service plan. When asked about two specific requirements of the plan, Wilson confirmed that Mother had not paid any child support or consistently visited the children. Mother provided no competing evidence.

We conclude that the caseworker's testimony provided legally and factually sufficient evidence to support a firm belief or conviction that Mother failed to comply with the court-ordered service plan. *See In re C.M.C.*, No. 14–12–00186–CV, 2012 WL 3871359, at *5 (Tex. App.—Houston [14th Dist.] Aug. 30, 2012, pet. denied) (mem. op. on reh'g) (concluding evidence was legally and factually sufficient to terminate based on Department caseworker's testimony, which was presented without objection or contravention, regarding parent's failure to comply with family service plan). Having concluded that the evidence was legally and factually under Subsection (O), we overrule Mother's fifth issue. We do not reach Mother's third and fourth issues, in which she challenges the sufficiency of the evidence under Subsections (F) and (N). *See In re T.G.R.-M.*, 404 S.W.3d at 16.

### 2.    Best interest

In addition to a predicate violation, the Department must establish by clear and convincing evidence that termination is in the children's best interest. TEX. FAM. CODE ANN. § 161.001(b). There is a strong presumption that children's best interest will be served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *see* TEX. FAM. CODE ANN. § 153.131.

The factfinder may consider a number of factors to determine the best interest of the child, including the desires of the child, the present and future physical and emotional needs of the child, the present and future emotional and

25

physical danger to the child, the parental abilities of the people seeking custody, programs available to assist those people in promoting the best interest of the child, plans for the child by those people or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate, and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). In some cases, undisputed evidence of only one factor may be sufficient to support a finding that termination is in the best interest of the child; in other cases, there could be more complex facts with evidence minimally implicating several factors but, collectively, not supporting a best-interest finding to terminate. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

The list of *Holley* factors is not exhaustive. 544 S.W.2d at 372. Other considerations may be pertinent to the best-interest analysis. *See id.* Additionally, the evidence supporting the statutory ground for termination may support a best-interest finding. *Id.* at 370.

Because both John and Mary were identified as having special needs in the beginning of their four-year stay in foster care, the Department included a requirement in Mother's family service plan that she complete a special-needs parenting class. Both John and Mary had significant improvement while in foster care, but John continued to demonstrate special needs. Nonetheless, Mother did not

complete her special-needs parenting class. In fact, she did not complete any requirement of her family service plan. This failure supports the trial court's best-interest finding. *See In re Z.B.*, No. 02-14-00175-CV, 2014 WL 5409103, at *9–11 (Tex. App.—Fort Worth Oct. 23, 2014, no pet.) (mem. op.) (concluding that mother's failure to complete services to improve her parenting skills supported finding that termination was in child's best interest); *LaRocca v. Tex. Dep't of Family and Protective Servs.*, No. 03-10-00103-CV, 2010 WL 4367065, at *8–9 (Tex. App.—Austin Nov. 4, 2010, no pet.) (mem. op.) (considering parent's ability to meet special needs of child in best-interest analysis).

Mother was given four years to complete her family service plan, yet failed. During those four years, the children were not available for adoption by a family able to provide a permanent, stable home. They saw their mother only six times in the twelve months that preceded the termination trial. This evidence supports the trial court's best-interest finding. *See In re Z.B.*, 2014 WL 5409103, at *10–11 (concluding that parent's infrequent visits supported trial court's best-interest finding and termination of parental rights).

According to the caseworker, four families recently had shown an interest in adopting Mary. The caseworker testified that she believed that termination would result in a permanent adoptive home for Mary.

27

She testified that she believed an adoptive home would result for John as well and explained that, after termination, the Department would conduct a nationwide search instead of the limited, statewide search that had been unsuccessful thus far. Additionally, the record includes Department placement-review reports that indicate continued improvement in John's interactions with his caregivers and reductions in the intensity of care he required since the earlier order. As examples, he had been moved from a facility identified as providing "intense" care to one designated to provide the lesser, "specialized" level of care, he no longer showed signs of intense aggression towards his caregivers, and he no longer required the significant assistance with his personal hygiene that he had needed in the past. This evidence supported a conclusion that John had become more suited to an adoptive family placement, as Mary had, though with continuing special needs.

The recent interest in adopting Mary and the possibility of accessing potential adoptive parents for John provide additional support for the trial court's conclusion that termination of Mother's parental rights was in the children's best interest. *See In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.) (holding that termination of parental rights was in four-year-old child's best interest in part because she had been in foster care since she was one year old); *In re M.J.W.*, No. 14-16-00276-CV, 2016 WL 4206046, at *6 (Tex. App.—Houston

28

[14th Dist.] Aug. 9, 2016, pet. denied) (mem. op.) (concluding that autistic 13-year-old child's need for permanence and Department's ability to conduct nationwide search for adoptive parents if parental rights were terminated supported best-interest finding and termination).

Moreover, with regard to John's special needs, we note that John's father—who is not a party to this appeal—voluntarily relinquished his parental rights, and Mother failed to avail herself of the parenting class that she was ordered to take to gain the skills needed to parent a special-needs child. The ability to be placed with individuals capable of addressing John's needs further supports the trial court's best-interest finding.

This evidence supports multiple *Holley* factors and likewise provides legally and factually sufficient evidence on which the trial court reasonably could have found that termination of Mother's parental rights was in the children's best interest. We overrule Mother's sixth issue.

## Father's Parental Rights

Father argues that the evidence is legally and factually insufficient to support termination of his parental rights under any of the three bases specified in the termination order: (E) (engaging in conduct that endangers), (N) (constructive abandonment), and (O) (failure to comply with court-ordered plan). He also argues that the evidence is legally and factually insufficient to support the trial court's

ruling that termination is in Mary's best interest or its determination that a substantial and material change has occurred to permit a change in conservatorship.

We will first consider whether the trial court erred by concluding that termination was warranted under Subsection (E).

## A.      Termination under Subsection (E)

In his first issue, Father argues that the evidence is legally and factually insufficient to support termination under Subsection (E). Under subsection (E), parental rights may be terminated if there is a finding, by clear and convincing evidence, that the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(E). The cause of the endangerment must be the parent's conduct, and the endangerment must result from a conscious course of conduct, rather than a single act or omission. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Endangerment can be exhibited by both actions and failures to act. *Id.* It is not necessary that the parent's conduct be directed at the child or that the child actually be injured; rather, "a child is endangered when the . . . parent's course of conduct creates a potential for danger which the parent is aware of but disregards." *Id.*; *see*

*In re A.H.A.*, No. 14-12-00022-CV, 2012 WL 1474414, at *6 (Tex. App.—Houston [14th Dist.] Apr. 26, 2012, no pet.) (mem. op.).

"A parent's abusive or violent conduct can produce a home environment that endangers a child's well-being." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). And repeated periods of incarceration can subject a child to a life that is uncertain and unstable, which is a factor to consider on the endangerment issue. *See In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.) ("Conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child."). Therefore, findings of criminal history, imprisonment, and family violence can be considered as factors supporting the termination of parental rights under Subsection (E). *See In re J.I.T.P.*, 99 S.W.3d at 845 ("Domestic violence, want of self control, and propensity for violence may be considered as evidence of endangerment."); *In re C.H.*, 89 S.W.3d at 28.

Father has a history of violent, criminal behavior. The Department proffered judgments of conviction for two felony assaults. Both were committed with the use of a deadly weapon. The caseworker testified that Father also had assaulted Mary's mother in the past. These violent behaviors led to multiple terms of incarceration, including two out of Mary's first three years of life. Father's past violent, criminal history provides legally and factually sufficient evidence to support a firm belief or

conviction that Father engaged in conduct that endangers Mary's physical or emotional well-being, supporting termination under Subsection (E).

We, therefore, overrule Father's first issue. We do not reach Father's second and third issues, challenging termination under Subsections (N) and (O).

## B.    Best interest

Father's fourth and final issue challenges the sufficiency of the evidence supporting the trial court's determination that it was in Mary's best interest to terminate his parental rights.

Father acknowledged that in the two years that he had been out of prison, he visited Mary only eight to ten times. Further, he did not complete the requirements of his family services plan by the court-imposed deadline or even after receiving an extension of time. Specifically, he did not complete individual counseling even though he had a history of assaults, including against family members. Evidence that supports a trial court's finding that a parent has committed one or more acts specified in the Family Code as grounds for termination can also support a finding that termination is in the child's best interest. *See In re C.H.*, 89 S.W.3d at 28.

Other than Father's minimal visits with Mary, there was no other evidence of efforts by Father during the two years he has been out of prison to develop a parental bond with Mary. He did not pay child support, bring items to their visits to foster their interaction, or acknowledge any of her milestones through cards,

letters, phone calls, or other forms of communication. There was no evidence he took any interest in her social development or school progress either.

The Department caseworker, Wilson, informed the trial court during her testimony that, according to Mother, Father had visited Mary only once before his most recent period of imprisonment. Father denied the assertion, stating that Mother had been untruthful. As factfinder, the trial court was permitted to evaluate the credibility of the witnesses and accept or reject any portion of any witness's testimony. *See In re A.H.A.*, 2012 WL 1474414, at *12. The trial court reasonably could have rejected Father's testimony and concluded that Father had had direct contact with Mary only nine to eleven times in the five years of her life.

Father's limited involvement in Mary's life, before and after prison, evidence a lack of ability to parent and meet Mary's future needs. *See In re Z.B.*, 2014 WL 5409103, at *10–11 (concluding that parent's lack of interaction with child supported trial court's best-interest finding and termination of parental rights).

The caseworker testified that four families had shown an interest in adopting Mary and she expected that a home would be approved. She testified that termination of Father's parental rights was in Mary's best interest because it allowed her to transition out of long-term foster care into a permanent and stable adoptive home. *See In re M.J.W.*, 2016 WL 4206046, at *6 (concluding that child's

33

need for permanence supported best-interest finding and termination); *see also In re N.R.T.*, 338 S.W.3d at 677 (holding that termination of parental rights was in four-year-old child's best interest in part because she had been in foster care since she was one year old).

We conclude that the trial court's determination of Mary's best interest is supported by clear and convincing proof that is legally and factually sufficient. Before we overrule this issue, though, we address an argument Father includes as a sub-issue: whether there was insufficient evidence of a material and substantial change in Mary's circumstances.

## C.     Material and substantial change in circumstances

As part of his best-interest argument, Father argues that there was legally and factually insufficient evidence of a material and substantial change to warrant modification, referencing Section 156.101 of the Family Code, as Mother did. We conclude, as we did with Mother, that Father's failure to complete his plan by the court-ordered deadline provided legally and factually sufficient evidence from which the trial court could have formed a firm belief or conviction that there had been a material and substantial change in Father's circumstances. *See In re J.R.*, 2012 WL 1605738, at *4–5. We overrule Father's fourth issue.

## Conclusion

We affirm the trial court's judgment terminating Mother's and Father's parental rights.

Harvey Brown
Justice

Panel consists of Justices Massengale, Brown, and Huddle.