**Opinion issued May 21, 2019**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-18-00663-CV

————————————

**JAMES NOTEWARE, Appellant**

**V.**

**SYLVESTER TURNER, MAYOR OF THE CITY OF HOUSTON, TEXAS AND CITY OF HOUSTON, TEXAS, Appellees**

---

**On Appeal from the 269th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-83251**

---

# O P I N I O N

In this election contest case, appellant, James Noteware, challenges the sufficiency of the ballot language setting out a bond measure in the City of Houston's November 2017 election. The trial court granted the plea to the jurisdiction filed by the City of Houston (the City) and dismissed the election

contest. In two issues on appeal, Noteware argues that the trial court erred (1) in ruling that the case was no longer justiciable and (2) in "failing to grant" his motion for summary judgment seeking a ruling that the ballot language was insufficient as a matter of law. Because we conclude that the election contest is moot, we affirm the trial court's judgment granting the City's plea to the jurisdiction and dismissing the case.

## Background

To address shortfalls in certain City of Houston municipal pension systems, including the Houston Municipal Employees Pension System (HMEPS) and that Houston Police Officers' Pension System (HPOPS), the legislature passed a pension reform bill, referred to as Senate Bill 2190. Senate Bill 2190 was signed into law on May 31, 2017, and it made various changes to the troubled pension systems, including reducing certain pension benefits, increasing employee contributions, and adopting more conservative actuarial assumptions, among other things. The bill also required the City to hold an election to approve the issuance of over $1 billion in pension obligation bonds to fund a portion of the unfunded liability with respect to the HMEPS and the HPOPS.

In addition to the legislative directives regarding pension reform, the City must also abide by the provisions of its charter. Relevant here, Article III, Section 1(a) of the City Charter provides:

The City Council shall not, without voter approval, levy ad valorem taxes at combined rates expected to result in total ad valorem tax revenues for the then current fiscal year that exceed the lower of (i) the allowable ad valorem tax revenues increased by the rate of inflation . . . plus the rate of growth in the City's population . . . , or (ii) the amount of total ad valorem taxes, both current and delinquent, actually collected during the prior fiscal year, increased by 4.5% of that amount and, as to the calculations in (a)(i) and (a)(ii) hereinabove, excluding ad valorem tax revenues required by state law to be deposited in a tax increment fund and adding those attributable to each annexation occurring after July 1, 2005, for the first year after such annexation.

Thus, the City Charter places a "cap" on the amount that ad valorem taxes may be increased in any fiscal year (the "revenue cap").

On August 9, 2017, the City passed Ordinance 2017-608 ordering an election to be held on November 7, 2017, to submit to voters a proposition for the issuance of pension obligation bonds for the purpose of funding a portion of the unfunded pension systems. Ordinance 2017-608 set out the following language for Proposition A:

Shall the City Council of the City of Houston, Texas, be authorized to issue bonds of the City, which may be called City of Houston, Texas, Pension Obligation Bonds in the amount of $1,010,000,000, maturing serially or otherwise at such times as may be fixed by the City Council, not to exceed 40 years from their date or dates and bearing interest at any rate or rates, either fixed, variable or floating, according to any clearly stated formula, calculation or method, not exceeding the maximum interest rate now or hereafter authorized by law, and to sell said bonds at any price or prices, all as shall be determined within the discretion of the City Council at the time of issuance, and to levy a tax upon all taxable property in the City annually sufficient to pay the principal of and interest on the bonds (together with any bonds that may be issued to refund the bonds) as it accrues or accretes, and to

3

provide a sinking fund for the payment of the principal of the bonds (together with any bonds that may be issued to refund the bonds) as they mature, as well as all payments under any credit agreements, such tax to be levied without being limited by any provisions of the City's home rule charter limiting or otherwise restricting the City's combined ad valorem tax rates or combined revenues from all City operations, for the purpose of funding a portion of the unfunded liability of the City with respect to the Houston Police Officers' Pension System and the Houston Municipal Employees Pension System as contemplated by the pension reform plan contained in Senate Bill 2190 (adopted in the 85th (2017) Texas Legislature, Regular Session), and all matters necessary or incidental thereto?

The election was held November 7, 2017. The ballot included the following language regarding Proposition A:

<u>City of Houston, Proposition A</u>
The issuance of $1,010,000,000 pension obligation bonds for the purpose of funding a portion of the unfunded liability of the City with respect to the Houston Police Officers' Pension System and the Houston Municipal Employees Pension System as contemplated by the pension reform plan contained in Senate Bill 2190 (adopted in the 85th (2017) Texas Legislature, Regular Session), and the levying of taxes sufficient for the payment thereof and interest thereon.

The majority of voters approved Proposition A. The City's canvass reflected that 77% of voters supported the measure.

On November 15, 2017, the City Council adopted Ordinance 2017-884, authorizing the City to issue the bonds, to prepare an official statement with respect to the bonds, and to seek approval of the bonds by the Texas Attorney General, as required by Texas law. The City then certified the results of the election on November 17, 2017.

4

In order to seek the Attorney General's approval of the bonds, the City prepared and executed in December 2017 a "General, No-Litigation and Signature Identification Certificate." The Certificate provided information regarding the City's ad valorem tax value and the outstanding principal amount of obligations of the City payable from its ad valorem taxes. The Certificate further stated that "[t]he City is in compliance with Article III, Section 1 of the City Charter," and it provided calculations "showing the City's capacity to pay the principal amount of all of its authorized tax-support bonds, notes and other obligations in any fiscal year, plus interest," which it would do "through the levy of an ad valorem tax rate not in excess of the 'bond allowable' rate of $1.50 established by the Attorney General based on the lowest historical tax collection rate in the most recent three tax years" and "without providing for a 4.5% increase (or such lower percentage as may be prescribed by the City's Charter) in the total tax revenue of the City from one fiscal year to the next." The Certificate stated, "The City has levied, and covenanted to levy in each year in which the Bonds are outstanding, an ad valorem tax sufficient (together with other lawfully available funds) to provide for the payment of interest on and principal of the Bonds." The Certificate also made an "election certification" providing:

> The City's bond election held on November 7, 2017 was conducted in accordance with the applicable provisions of the state and federal law, including the bilingual requirements of Chapter 272 of the Texas Election Code. The Bonds are being issued in compliance with the

revenue limitations contained in Article III, Section 1 of the City Charter, and the payment of the Bonds will be made in compliance with the revenue limitations contained in the Article III, Section 1 of the City Charter.

Noteware filed his election contest on December 15, 2017, challenging the "materially misleading ballot description for Proposition A in the November 2017 election." Noteware asserted that Proposition A authorized the City to levy a tax in excess of the revenue cap in order to pay off the bonds. He further alleged that this authorization was a chief feature of Proposition A and that the ballot measure presented in the election did not inform voters of the full import of their vote. *See Dacus v. Parker*, 466 S.W.3d 820, 826 (Tex. 2015) (holding that ballot description may be insufficient when it misleads voters by omitting certain chief features that reflect its character and purpose).

On December 19, 2017, Noteware filed an emergency motion for a temporary restraining order and temporary injunction. *See, e.g.*, TEX. ELEC. CODE ANN. § 233.010 (providing that filing election contest does not suspend implementation of contested measure that is shown by officially determined result to have been adopted, except that in application of equitable principles, court may suspend implementation of contested measure pending outcome of election contest).

The Attorney General issued his opinion approving the bonds on December 20, 2017. The opinion provided that the "Office of the Attorney General has

6

examined the law and such certified proceedings and other papers as we deem necessary to render this opinion." The opinion further stated, "As to questions of fact material to our opinion, we have relied upon representations of the Issuer [the City] contained in the certified proceeds and other certifications of public officials furnished to us without undertaking to verify the same by independent investigation." The opinion concluded that "the Bond has been issued in accordance with law and is a valid and binding obligation of the Issuer," that "[t]he Bond is payable from the proceeds of an annual ad valorem tax levied against all taxable property in the Issuer, within the limits prescribed by law," and that the "proceedings conform to the requirements of law." The Attorney General approved the bond.

The Attorney General's opinion accompanied the Texas Comptroller of Public Accounts' certificate registering the bonds, also executed and registered on December 20, 2017. The transmittal letter from the Attorney General's Office accompanying the opinion and certificate stated: "Please note . . . for future tax obligations, the outstanding amount of 2017 Pension Obligation Bonds must continue to be included in the combined debt service schedule for purposes of demonstrating compliance with the tax coverage test as well as tax limit requirements of article III, section 1(a) of the city charter."

On December 21, 2017, the trial court held a hearing on Noteware's motion for a temporary restraining order and temporary injunction. The trial court denied the requested relief.

On December 22, 2017, the bond closing occurred. The bonds were issued and delivered: $750 million in bond proceeds were distributed to the HPOPS, and $250 million in bond proceeds were distributed to the HMEPS. The remainder of the proceeds were paid to the underwriter and the City to cover the costs of issuing the bonds.

On February 27, 2018, the City moved to dismiss Noteware's claims based on the lack of subject-matter jurisdiction. The City argued that Noteware's election contest did not present a justiciable claim:

> The Texas Attorney General's opinion approving and validating the bonds and confirming that the bonds are payable from the proceeds of an annual ad valorem tax levied against all taxable property in the City "within the limits prescribed by law," together with the City's certification to the Attorney General that payment of the bonds will be made in compliance with the City Charter's property tax revenue cap, render moot Noteware's election contest claim.

The City argued in the alternative that Noteware's claim was not ripe because "its resolution depends on contingent or hypothetical facts and events that have not yet come to pass."

Noteware filed a motion for summary judgment, asserting that he was entitled to judgment as a matter of law that the ballot language was materially misleading under *Dacus*.

The trial court ultimately dismissed Noteware's claim for lack of subject-matter jurisdiction. It did not rule on Noteware's motion for summary judgment. This appeal followed.

## Subject-Matter Jurisdiction

In his first issue, Noteware argues that the trial court erred in dismissing his suit for lack of subject-matter jurisdiction.

### A.    Standard of Review

Subject-matter jurisdiction implicates questions of law, which this Court reviews de novo. *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002).

The mootness doctrine implicates a court's subject-matter jurisdiction, which "is essential to a court's power to decide a case." *See State v. Naylor*, 466 S.W.3d 783, 791–92 (Tex. 2015); *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 865 (Tex. 2010). A controversy must exist between the parties at every stage of the legal proceedings, including the appeal. *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005) (orig. proceeding); *Bd. of Adjustment of San Antonio v. Wende*, 92 S.W.3d 424, 427 (Tex. 2002). "If a controversy ceases to exist—'the

issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome'—the case becomes moot." *Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)). A case is moot when a judgment cannot have a practical effect on an existing controversy. *Reule v. RLZ Invs.*, 411 S.W.3d 31, 32 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *see also Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995) (holding that "justiciable controversy" exists when there is "a real and substantial controversy involving genuine conflict of tangible interests and not merely a theoretical dispute"); *Trinity Universal Ins. Co. v. Sweatt*, 978 S.W.2d 267, 270 (Tex. App.—Fort Worth 1998, no pet.) (stating that justiciable controversy is "a real controversy between the parties that will be actually determined by the judicial declaration sought"). Without a justiciable controversy, a trial court must dismiss a case for lack of subject-matter jurisdiction. *Transp. Ins. Co. v. WH Cleaners, Inc.*, 372 S.W.3d 223, 227 (Tex. App.—Dallas 2012, no pet.).

## B.    Analysis

Noteware filed the underlying election contest in December 2017 alleging that the ballot language used by the City in the November 2017 election on Proposition A was insufficient. Specifically, Noteware asserted that Proposition A authorized the City to levy a tax in excess of the revenue cap in order to pay off the bonds and that the ballot measure presented in the election did not inform voters of

this provision, which he argues was a chief feature of Proposition A. *See Dacus*, 466 S.W.3d at 826; *see also Rossano v. Townsend*, 9 S.W.3d 357, 361–62 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (recognizing that election contest is not ordinary lawsuit but is special proceeding in which district court's authority to act is limited to subjects or grounds expressly or impliedly authorized by Election Code, and stating, "An election contest includes any type of suit in which the validity of an election or any part of the elective process is made the subject matter of litigation").

The City argues that, because the bonds have already issued, the taxes to pay the bonds have been levied, and the required sinking fund has been created, there is no justiciable controversy. The City asserts that even if this Court were to make a judicial determination on the issue raised by Noteware's election contest in his favor, the determination would have no practical legal effect because "the Court could not order a new election nor could it order the City to conduct a new election." Rather, the court could only void the results of the Proposition A election. *See* TEX. ELEC. CODE ANN. § 233.011 (providing, in relevant part, that court "may not order a new election to be held if the contested election is declared void"). But because the bonds have been issued and sold, taxes to finance the bonds have been levied, and a sinking fund has been created, even voiding the election results would not have any impact.

11

The City presented evidence that it followed the statutory procedure for issuing the bonds and that the bonds have, in fact, issued. Under Government Code section 1202.003, the City was required to submit the bonds and a record of the proceedings leading up to the bonds' creation to the Attorney General for approval:

> (a) Before the issuance of a public security, the issuer shall submit the public security and the record of proceedings to the attorney general.
>
> (b) If the attorney general finds that the public security has been authorized to be issued in conformity with law, the attorney general shall:
>
>> (1) approve the public security; and
>>
>> (2) deliver to the comptroller:
>>
>>> (A) a copy of the attorney general's legal opinion stating that approval; and
>>>
>>> (B) the record of proceedings.
>
> (c) Unless exempted by Section 1202.007, the issuance of a public security except in compliance with this chapter is prohibited.

TEX. GOV'T CODE ANN. § 1202.003; *see also id.* § 1202.001(3) (defining "public security" as including bonds issued or incurred by issuer under issuer's borrowing power); *id.* § 1371.057(a) (providing that before "an obligation"—including public securities—may be issued, "a record of the proceedings of the issuer authorizing the issuance, execution, and delivery of the obligation or credit agreement and any

12

contract providing revenue or security to pay the obligation or credit agreement must be submitted to the attorney general for review").

The City presented to the trial court the record of proceedings that it had submitted to the Attorney General for approval of the bonds, including the ordinances passed by the City Council and the Certificate created and executed by City officials pursuant to those ordinances. The Certificate provided information regarding the City's ad valorem tax value and the outstanding principal amount of obligations of the City payable from its ad valorem taxes and expressly stated that "[t]he City is in compliance with Article III, Section 1 of the City Charter." The City demonstrated its ability and intention to pay its bond obligations "through the levy of an ad valorem tax rate not in excess of the 'bond allowable' rate of $1.50 established by the Attorney General based on the lowest historical tax collection rate in the most recent three tax years" and "without providing for a 4.5% increase (or such lower percentage as may be prescribed by the City's Charter) in the total tax revenue of the City from one fiscal year to the next." The Certificate stated, "The City has levied, and covenanted to levy in each year in which the Bonds are outstanding, an ad valorem tax sufficient (together with other lawfully available funds) to provide for the payment of interest on and principal of the Bonds." The Certificate also made an "election certification" providing, in relevant part, that "[t]he Bonds are being issued in compliance with the revenue limitations contained

13

in Article III, Section 1 of the City Charter, and the payment of the Bonds will be made in compliance with the revenue limitations contained in the Article III, Section 1 of the City Charter."

Relying on the information provided, the Attorney General issued an opinion approving the bonds. The opinion concluded that the bonds were issued "in accordance with law" and that they were "payable from the proceeds of an annual ad valorem tax levied against all taxable property in the Issuer [the City], within the limits prescribed by law." The Attorney General opinion accompanied the Texas Comptroller of Public Accounts' certificate registering the bonds, also executed and registered on December 20, 2017. The transmittal letter from the Attorney General's Office accompanying the opinion and certificate stated: "Please note . . . for future tax obligations, the outstanding amount of 2017 Pension Obligation Bonds must continue to be included in the combined debt service schedule for purposes of demonstrating compliance with the tax coverage test as well as tax limit requirements of article III, section 1(a) of the city charter." Upon receiving this approval, the City issued and sold the bonds, and the proceeds were distributed accordingly.

Once the bonds were approved by the Attorney General and registered by the Comptroller, they became incontestable. Government Code section 1202.006

14

addresses the "Validity and Incontestability" of public securities upon approval by the Attorney General and registration by the Comptroller:

> (a) A public security and any contract the proceeds of which are pledged to the payment of the public security are valid and incontestable in a court or other forum and are binding obligations for all purposes according to their terms:
>
> > (1) after the public security is approved by the attorney general and registered by the comptroller; and
> >
> > (2) on issuance of the public security.
>
> (b) In any action brought to enforce the collection of county or municipal bonds that are payable from ad valorem taxes and that have been approved by the attorney general and registered by the comptroller, the certificate of the attorney general shall be admitted as evidence of the validity of the bonds and the interest coupons pertaining to the bonds.

TEX. GOV'T CODE ANN. § 1202.006; *see also id.* § 1371.059(a) (obligations, including public obligation bonds, are incontestable once approved by Attorney General and registered by Comptroller); *Leonard v. Cornyn*, 47 S.W.3d 524, 527–28 (Tex. App.—Austin 1999, pet. denied) (court lacks subject-matter jurisdiction to consider challenge to validity of public obligation bonds that have been approved by Attorney General and registered by Comptroller).  Thus, even if Noteware succeeded in invalidating the election approving Proposition A, it would have no impact on the validity of the bonds, which have already been issued and sold.

Furthermore, the bonds were approved, issued, and sold based on the City's ability to pay its bond obligations in compliance with the revenue cap set out in Article III, section 1(a) of the City Charter. The City expressly represented that the taxes to support the bond repayments were levied in compliance with the revenue cap, and the Attorney General stated in both its opinion and transmittal letter that the taxes levied for bond repayment must comply with the law, including Article III, section 1(a) of the City Charter. Even if Noteware's allegation is correct—that the language of Proposition A would have permitted the City to levy taxes to repay the bonds without being limited by the revenue cap—the subsequent process of approving and issuing the bonds demonstrates that the City has fulfilled its obligations while also remaining compliant with the revenue cap.

Noteware does not allege that the City is currently violating the revenue cap, nor does he present any evidence that such a violation has occurred or is imminent. Rather, he argues that the City could rely on the voter's approval of Proposition A to levy such a tax that exceeds the revenue cap in the future. However, as discussed above, the Attorney General approved the bonds based on the City's representations that it would levy taxes in accordance with the law, including the revenue cap, and the Attorney General's office expressly stated that "the outstanding amount of 2017 Pension Obligation Bonds must continue to be included in the combined debt service schedule for purposes of demonstrating

16

compliance with the tax coverage test as well as tax limit requirements of article III, section 1(a) of the city charter."

Noteware also argues that the representations by the City and the Attorney General do not render his election contest moot. He argues that the Attorney General's review was done based solely on the City's representations. Noteware also argues that the City is not bound by the representations of its lawyers or other individual officials, and, thus, the approval to levy taxes granted by the Proposition A election presents a current legal controversy that can be addressed by resolution of his election contest. But the documents submitted to the Attorney General for approval of the bonds are not mere isolated "representations" of an individual City official. The City is now bound by the terms of the bonds—including the taxes levied to fulfill the City's bond payment obligations—that were issued and sold after approval by the Attorney General. *See* TEX. CONST. art. XI, § 5(a) ("[N]o debt shall ever be created by any city, unless at the same time provision be made to assess and collect annually a sufficient sum to pay the interest thereon and creating a sinking fund[.]"); TEX. GOV'T CODE ANN. § 1202.006(a) (providing that public securities and any contract with proceeds pledged to payment of public securities are valid and incontestable in court or other forum and are binding obligations for all purposes according to their terms after approval, registration, and issuance), § 1371.059 (providing that, on approval by Attorney General, registration by

17

Comptroller, and initial delivery of obligation, such obligation "is incontestable in a court or other forum and is valid, binding, and enforceable according to its terms").

Thus, the City is bound by the representations and approvals made in the process of issuing and selling the bonds, including its levying a tax within the limits of the revenue cap to repay its bond obligations. Thus, even if the trial court were to have considered the merits of Noteware's election contest claim that the ballot language was insufficient to warn voters that the City might exceed the revenue cap, such a decision could have no practical effect. The City has already implemented the bond ordinance in compliance with the revenue cap.

Finally, Noteware argues that his case is not moot because the capable-of-repetition-yet-evading-review exception applies. "This exception applies only in rare circumstances." *Williams*, 52 S.W.3d at 184. To invoke the exception, Noteware must prove that: (1) the challenged action was too short in duration to be litigated fully before the action ceased or expired; and (2) a reasonable expectation exists that the same complaining party will be subjected to the same action again. *See id.* While the City may seek approval of new bond measures in the future, Noteware presented no evidence that a similar discrepancy between the language of the proposed proposition and the ballot language will necessarily be present, nor

has he presented any evidence that allegedly insufficient ballot language cannot be challenged and litigated fully. *See id.*

Accordingly, we conclude that the trial court correctly dismissed Noteware's election contest for want of jurisdiction. *See Naylor*, 466 S.W.3d at 791–92; *Joachim*, 315 S.W.3d at 865; *Transp. Ins. Co.*, 372 S.W.3d at 227. We overrule Noteware's first issue.

In his second issue, Noteware argues that the trial court erred in "failing to grant" his motion for summary judgment on the merits of his election contest. The record reflects that the trial court declined to rule on his motion for summary judgment because it determined that it lacked subject-matter jurisdiction over the claim. Because this Court has likewise determined that the trial court lacked subject-matter jurisdiction over the election contest, we conclude that the trial court did not err in refusing to rule on Noteware's motion for summary judgment.

## Conclusion

We affirm the judgment of the trial court dismissing Noteware's election contest for lack of subject-matter jurisdiction.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Landau.

19